J-S63006-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| LAWRENCE HURD | : | |
| | : | |
| Appellant | : | No. 1447 EDA 2019 |

Appeal from the Judgment of Sentence Entered May 10, 2019
In the Court of Common Pleas of Chester County
Criminal Division at No(s):  CP-15-CR-0001284-2018

BEFORE:   GANTMAN, P.J.E., MURRAY, J., and STRASSBURGER, J.[*]

MEMORANDUM BY GANTMAN, P.J.E.:               **FILED DECEMBER 30, 2019**

Appellant, Lawrence Hurd, appeals from the judgment of sentence entered in the Chester County Court of Common Pleas, following his bench trial convictions for persons not to possess firearms, firearms not to be carried without a license, and possession of a controlled substance.[1]  We affirm.

In its opinions, the trial court fully and correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

> DID THE COURT ERR BY DENYING [APPELLANT'S] MOTION
> TO SUPPRESS PHYSICAL EVIDENCE—TO WIT, A FIREARM

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1); 35 P.S. § 780-113(a)(16), respectively.

AND CRACK COCAINE, WHEN POLICE ENTERED ONTO PROPERTY WHERE [APPELLANT] HAD A REASONABLE EXPECTATION OF PRIVACY, WITHOUT REASONABLE SUSPICION, TO CONDUCT AN INVESTIGATORY DETENTION, AND THE CONTRABAND THAT WAS FOUND AS A RESULT IN VIOLATION OF THE UNITED STATES CONSTITUTION AND THE GREATER PROTECTIONS OF THE PENNSYLVANIA CONSTITUTION?

DID THE COURT ERR BY DENYING [APPELLANT'S] MOTION TO SUPPRESS PHYSICAL EVIDENCE—TO WIT, A FIREARM AND CRACK COCAINE, WHEN POLICE ENTERED ONTO PROPERTY WHERE [APPELLANT] HAD A REASONABLE EXPECTATION OF PRIVACY WITHOUT A WARRANT BASED UPON PROBABLE CAUSE, CONSENT, HOT PURSUIT OR EXIGENT CIRCUMSTANCES, AND THE CONTRABAND WAS FOUND AS A RESULT OF A VIOLATION OF THE UNITED STATES CONSTITUTION AND THE GREATER PROTECTIONS OF THE PENNSYLVANIA CONSTITUTION?

(Appellant's Brief at 5).

Our standard of review of the denial of a motion to suppress evidence is as follows:

[An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where…the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on [the] appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the [trial court

- 2 -

are] subject to plenary review.

***Commonwealth v. Hoppert***, 39 A.3d 358, 361-62 (Pa.Super. 2012), *appeal denied*, 618 Pa. 684, 57 A.3d 68 (2012).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinions of the Honorable William P. Mahon and the Honorable Anthony A. Sarcione, we conclude Appellant's issues merit no relief. The trial court opinions comprehensively discuss and properly dispose of the questions presented. (***See*** Rule 1925(a) Trial Court Opinion, filed July 3, 2019, at 4) (referring to and attaching suppression court opinion). (***See also*** Suppression Court Opinion, filed September 13, 2018, at 20-36) (finding: **(1-2)** officers were called to scene by police dispatch upon two reports from same reporting party, about one hour apart, of individual walking around back of residential property with flashlight between 2:00 a.m. and 3:00 a.m.; upon hearing voices emanating from vehicle reported on dispatch, officers approached driver-side and passenger-side doors; at this point, officers subjected driver and passenger to investigatory detention; under totality of circumstances, including reliability of tip, location of suspect activity, time of night, fact that same reporting party called twice in one hour, and unusual nature of activity reported, officers had reasonable suspicion to conduct investigatory detention; Officer Davis stood outside passenger-side of vehicle where Appellant was sitting, which was parked in partially paved, partially graveled driveway behind reporting party's (and Appellant's

girlfriend's) residences; Officer Davis had authority to enter curtilage of private property for purposes of conducting investigation; Officer Davis was standing where he was lawfully permitted to be when he questioned Appellant; as Appellant moved his hand to retrieve identification, Officer Davis observed handle of gun protruding from Appellant's pants pocket; Officer Davis knew Appellant and had personal knowledge that Appellant was not permitted to carry firearm; officer properly seized gun, which he observed in plain view; officer had probable cause to arrest Appellant; marijuana fell from passenger side of vehicle during arrest of Appellant; lawful search incident to arrest revealed more drugs on Appellant's person; court properly denied Appellant's suppression motions). The record supports the trial court's decision. Accordingly, we affirm on the basis of the trial court's opinions.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/30/19

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

: CHESTER COUNTY, PENNSYLVANIA

VS.

: CRIMINAL ACTION - PCRA

LAWRENCE HURD : NO. 1284-2018

Nicholas J. Casenta, Jr., Esquire, Chief Deputy District Attorney for the Commonwealth
Thomas F. Burke, Esquire, Attorney for Defendant

## OPINION

AND NOW, this 3 day of July, 2019, this Opinion is filed pursuant to Pa. R.A.P.

1925 and in response to Lawrence Hurd's ("Defendant") timely Concise Statement of

Errors Complained of on Appeal filed on May 28, 2019.[1]

## FACUTAL AND PROCEURAL HISTORY

On November 19, 2018, after conducting a stipulated fact, non-jury, trial[2] the

Court found Defendant guilty of having committed the offenses of Persons Not to

Possess, Use, Manufacture, Control, Sell or Transfer Firearms (Count III), in violation of

18 Pa.C.S.A. § 6105(a)(1), graded as a Felony of the First Degree (F-1); Firearms Not to

Be Carried Without a License (Count IV), in violation of the Pennsylvania Uniform

Firearms Act, 18 Pa.C.S.A. § 6106(a)(1), graded as a Felony of the Third Degree (F-3);

and Possession of a Controlled Substance (Crack Cocaine) (Count VII), in violation of

---

[1] Defendant is appealing from the judgment of sentence entered by the Court on May 10, 2019. (See Notice of Appeal, 5/10/19). Specifically, Defendant challenges the September 13, 2018 denial of his two (2) suppression motions.

[2] On November 13, 2018, immediately prior to trial, Defendant entered a knowing, voluntary, and intelligent waiver of his right to a jury trial in this matter. (See Written Colloquy for Waiver of Jury Trial, 11/13/18).

1



the Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. § 780-113(A)(16).[3] See Verdict, 11/19/18.

Defendant waived his right to appear in open-court for the announcement of the Verdict. Sentencing was deferred in this matter for the preparation of a Pre-Sentence Investigation ("PSI") Report.

On May 10, 2019, after reviewing the PSI, the Court sentenced Defendant as follows: on Count III of the Information, Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms (graded as an F-1), Defendant received a state sentence of four (4) to eight (8) years of incarceration. On Count IV of the Information, Firearms Not to Be Carried Without a License, Defendant received two (2) years of probation, consecutive to the sentence imposed on Count III. Defendant received no additional sentence for the one count of Possession of a Controlled Substance. Thus, Defendant received an aggregate sentence of four (4) to eight (8) years of incarceration in a state correctional institution followed by two (2) years of probation. (See Sentencing Sheet, 5/10/19).

---

[3] Immediately prior to trial on November 13, 2018 and on the record, in open-court, the Commonwealth withdrew Count I of the Information, charging a violation of the Controlled Substance, Drug, Device and Cosmetic Act (Manufacture, Deliver or Possess with Intent to Manufacture or Deliver Marijuana and Cocaine, 35 P.S. § 780-113(A)(30); Count II of the Information, charging Receiving Stolen Property ("RSP"), in violation of 18 Pa.C.S.A. § 3925(a); Count V of the Information, charging Possessing Instruments of Crime ("PIC"), in violation of 18 Pa.C.S.A.§ 907(b); Count VI of the Information, charging Resisting Arrest or Other Law Enforcement, in violation of 18 Pa.C.S.A. § 5104; Count VII, charging a violation of the Controlled Substance, Drug, Device and Cosmetic Act (Possession of Marijuana), 35 P.S. § 780-113(A)(16), but only the portion of Count VII that charged Possession of Marijuana; and Count VIII, charging a violation of the Controlled Substance, Drug, Device and Cosmetic Act (Drug Paraphernalia, 35 P.S. § 780-113(A)(32). ( See Verdict, 11/19/18).

2

Defendant received the applicable credit for time served on the sentence and was represented at trial and sentencing by Thomas F. Burke, Esquire. At sentencing, the Court also determined that Defendant was ineligible for the Recidivism Risk Reduction Incentive ("RRRI") program.

Defendant did not file any post-sentence motions. On May 10, 2019, the same day sentence was imposed; Defendant filed a counseled Notice of Appeal from the judgment of sentence. By Order dated May 14, 2019, Defendant was directed to file and serve upon the undersigned[4] a Concise Statement of Errors Complained of on Appeal ("Concise Statement"). On May 28, 2019, Defendant filed and properly served a timely Concise Statement.

## DISCUSSION

In his Concise Statement, Defendant raises two (2) issues for our review. In Defendant's own words, those issues are as follows:

1.  Did the Court err in failing to suppress all physical evidence recovered from Hurd when the Officers lacked reasonable suspicion to conduct an investigatory detention of Hurd?

2.  Did the Court err in failing to suppress all physical evidence recovered from Hurd when the Officers entered upon Hurd's curtilage without a warrant based upon probable cause, without consent, hot pursuit or exigent circumstances?

(See Concise Statement, 5/28/19, unpaginated).

---

[4] This case was reassigned to the undersigned on December 4, 2018.

3

The Court has previously addressed Defendant's suppression issues in its comprehensive Opinion and Order dated September 13, 2018.[5] Therefore, in lieu of a newly fashioned yet redundant analysis, we refer the Superior Court to the Court's Opinion, dated September 13, 2018, in which the Court cogently reviewed Defendant's suppression issues and set forth our reasons for denying his claims. It is for the same reasons articulated in the aforesaid Opinion and Order that the Court denied Defendant's suppression motions as devoid of arguable merit. A copy of the September 13, 2018 Opinion and Order is attached for the Superior Court's convenience as "Court Exhibit A".

For the reasons set forth above and in the September 13, 2018 Opinion and Order, it is respectfully requested that the decisions of this Court be affirmed.

BY THE COURT:

_____
William P. Mahon,        J.

---

[5] By way of brief background, on June 14, 2018, Defendant filed a counseled Omnibus Pre-Trial Motion, including a motion for the suppression of evidence, based on his claim that the police unlawfully searched his place of residence and seized his person and effects without the requisite cause under the Federal and State Constitutions. On July 18, 2018, Defendant filed a second suppression motion, titled "Motion to Suppress Physical Evidence, which essentially reiterated the same claims made in his earlier Omnibus Pre-Trial Motion. An evidentiary hearing was held on Defendant's Motions on July 26, 2018. On September 13, 2018, the Court issued a 37 page Opinion and Order including findings of fact and conclusions of law, wherein the Court denied Defendant's Motions. (See Opinion and Order, 9/13/18).

4

Court Exhibit A – September 13, 2019 Opinion and Order

s:\admin\sarcione\Hurd Lawrence Suppression.docx

**COMMONWEALTH OF PENNSYLVANIA** : IN THE COURT OF COMMON PLEAS

**vs.** : CHESTER COUNTY, PENNSYLVANIA

**LAWRENCE HURD** : NO. 15-CR-0001284-2018

: CRIMINAL ACTION—LAW

*Thomas Ost-Prisco, Esquire, for the Commonwealth*
*Thomas F. Burke, Esquire, for the Defendant*

## OPINION

On April 26, 2018 the Commonwealth filed an Information against the Defendant, Lawrence Hurd, charging him with one (1) count (Count I) of Violation of the Controlled Substance, Drug, Device, and Cosmetic Act (Manufacture, Deliver or Possess with Intent to Manufacture or Deliver) (Marijuana and Crack Cocaine), 35 P.S. § 780-113(A)(30); one (1) count (Count II) of Receiving Stolen Property (Gun), 18 Pa. C.S.A. § 3925(a); one (1) count (Count III) of Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms, 18 Pa. C.S.A. § 6105(a)(1); one (1) count (Count IV) of violating the Pennsylvania Uniform Firearms Act (Firearms Not to Be Carried Without a License), 18 Pa. C.S.A. § 6106(a)(1); one (1) count (Count V) of Possessing Instruments of Crime, 18 Pa. C.S.A. § 907(b); one (1) count (Count VI) of Resisting Arrest or Other Law Enforcement (Officers Gregory Hines and Jared Davis), 18 Pa. C.S.A. § 5104; one (1) count (Count VII) of Violation of the Controlled Substance, Drug, Device, and Cosmetic Act (Possession of Controlled Substance)(Marijuana and Crack Cocaine), 35 P.S. § 780-113(A)(16); and one (1) count (Count VIII) of Violation of the Controlled Substance, Drug, Device, and Cosmetic Act (Drug Paraphernalia), 35 P.S. § 780-113(A)(32) stemming from his arrest on October 28, 2017.

1

DK+d

On June 14, 2018, Defendant filed a counseled Omnibus Pre-Trial Motion, including a motion for the suppression of evidence, based on his claim that the police unlawfully searched his place of residence and seized his person and effects without adequate cause under the Federal and State Constitutions. On July 18, 2018, Defendant filed a second motion to suppress, titled "Motion to Suppress Physical Evidence" which basically reiterated the claims made in his earlier Omnibus Pre-Trial Motion.

We held an evidentiary hearing on Defendant's Motions on July 26, 2018. After reviewing the record and the relevant constitutional, statutory and decisional law, we are now prepared to issue the following Findings of Fact and Conclusions of Law.

## I.  FINDINGS OF FACT

1. Officer Gregory Hines is a part-time patrol officer with the Valley Township Police Department. (Suppression Transcript, 7/26/18, N.T. 13-14).

2. On October 28, 2017 Officer Hines was on duty working the midnight to eight o'clock a.m. (8:00 a.m.) shift. (Suppression Transcript, 7/26/18, N.T. 14). Officer Hines was alone on patrol. (Suppression Transcript, 7/26/18, N.T. 20).

3. At approximately 2:00 a.m. on October 28, 2017, Officer Hines was dispatched to 44 South Park Avenue in Valley Township on the basis of a male caller who had told dispatch that there was a person walking around with a flashlight. (Suppression Transcript, 7/26/18, N.T. 14-16, 18, 34-36, 48-49).

4. The caller advised dispatch that the person was next to a specific car and he gave a description of the car the person was near. (Suppression Transcript, 7/26/18, N.T. 14-15).

5. The caller did not state that the person with the flashlight was looking into

2

any yards, windows, or vehicles. (Suppression Transcript, 7/26/18, N.T. 34-35).

6. The caller was calling from 44 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 35).

7. Officer Hines explained at the Suppression Hearing that South Park Avenue is a street in front of several row homes and Newport Avenue is the road that curves around the back side and goes up a hill. (Suppression Transcript, 7/26/18, N.T. 16, 19, 63).

8. Newport Avenue is a public thoroughfare. (Suppression Transcript, 7/26/18, N.T. 45, 63-64).

9. Number 44 South Park Avenue is at the end of the row of homes on South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 18-19; 7/26/18, Ex. D-1(A)).

10. Officer Hines stated that although he has not made any arrests in the area of South Park Avenue, this part of his patrol jurisdiction is "not a nice area." (Suppression Transcript, 7/26/18, N.T. 49-51). By the phrase "not a nice area", Officer Hines explained that he meant that the houses are run down and some of them are "almost like abandoned." (Suppression Transcript, 7/26/18, N.T. 50-51). Officer Hines testified that other officers in his department have made arrests in the vicinity of South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 51-52).

11. Exhibit D-1(A) shows numbers 44 and 46 of the unit block of South Park Avenue. (7/26/18, Ex. D-1(A)). This Exhibit, as with all of the pictorial Exhibits introduced by the defense, depict the vicinity of 44 and 46 South Park Avenue during daylight hours. (Suppression Transcript, 7/26/18, N.T. 52).

12. Exhibit D-1(B) is a wider panoramic view of South Park Avenue.

3

(Suppression Transcript, 7/26/18, N.T. 39-40; 7/26/18, Ex. D-1(B)).

13. Exhibit D-1(C) is the road that goes down along the side of 44 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 40; 7/26/18, Ex. D-1(C)).[1]

14. Exhibit D-1(D) is another picture of the road that goes along 44 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 40; 7/26/18, Ex. D-1(D)).

15. Exhibit D-1(E) is a picture of the road depicted in Exhibit D-1(D) from a little further down that road. (Suppression Transcript, 7/26/18, N.T. 41-42; 7/26/18, Ex. D-1(E)).

16. Exhibit D-1(F) depicts the rear of the residence at 44 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 42; 7/26/18, Ex. D-1(F)).

17. Exhibit D-1(G) depicts the fenced in portion of the rear of the residence at 44 South Park Avenue, the residence to which Officer Hines was dispatched. (Suppression Transcript, 7/26/18, N.T. 42, 53; 7/26/18, Ex. D-1(G)). The fence depicted in Exhibit D-1(G) also has a gate which appears to have a lock or a chain keeping it closed. (Suppression Transcript, 7/26/18, N.T. 53; 7/26/18, Ex. D-1(G)). Exhibit D-1(G) reflects that there is a paved section and a gravelly section to the right of the fenced in area which are not themselves fenced in. (Suppression Transcript, 7/26/18, N.T. 42-43; Ex. D-1(G)). Exhibit D-1(G) also depicts a type of carport or awning over the fenced in portion of the picture. (Suppression Transcript, 7/26/18, N.T. 53; 7/26/18, Ex. D-1(G)).

18. In order to reach Newport Avenue, a motorist must drive down Park

---

[1] We are making the inference here that Exhibit D-1(C) is what counsel purported it to be, as the witness did not ever answer counsel's leading question "this is the road that goes down along side of 44 South Park Avenue, correct?" (Suppression Transcript, 7/26/18, N.T. 40).

Avenue "and make a left to go around almost the row homes, go down the row, and go around to get to Newport Avenue." (Suppression Transcript, 7/26/18, N.T. 19).

19. Officer Hines is familiar with the area as part of his routine patrol. (Suppression Transcript, 7/26/18, N.T. 34).

20. Officer Hines traveled down Park Avenue and around towards Newport Avenue, then "made a left on Kirby and came out[.]" (Suppression Transcript, 7/26/18, N.T. 20).

21. Officer Hines did not see any person in the area with a flashlight and was unable to locate the person to whom the caller referred. (Suppression Transcript, 7/26/18, N.T. 17, 20, 35).

22. Officer Hines did not knock on the door of 44 South Park Avenue to ask the caller to clarify what he or she had seen. (Suppression Transcript, 7/26/18, N.T. 35, 39).

23. Because he could not see anyone in the area with a flashlight, Officer Hines "cleared the call out." (Suppression Transcript, 7/26/18, N.T. 20)

24. A little later that morning, around 3:00 a.m., Officer Hines was dispatched to the area a second time. (Suppression Transcript, 7/26/18, N.T. 15-16, 20, 23, 36).

25. Dispatch had received a second call from the same caller "and had the caller on the line giving more specific information to the dispatcher." (Suppression Transcript, 7/26/18, N.T. 20, 29, 36, 62). This time the dispatch included a reference to Newport Avenue. (Suppression Transcript, 7/26/18, N.T. 30).

26. The caller's identity was known to the police. (Suppression Transcript,

5

7/26/18, N.T. 20). The caller was calling from the residence at number 44 South Park Avenue and talking about that residence. (Suppression Transcript, 7/26/18, N.T. 21, 24, 36).

27. Given the juxtaposition of Park Avenue and Newport Avenue, Officer Hines was able to conclude that the caller was contacting police about a person with a flashlight located behind the caller's house. (Suppression Transcript, 7/26/18, N.T. 30).

28. Officer Hines did not personally speak with the caller; he received his information from the dispatcher. (Suppression Transcript, 7/26/18, N.T. 21, 36). However, Officer Hines was able to communicate to the caller indirectly through the dispatcher. (Suppression Transcript, 7/26/18, N.T. 21, 36).

29. The caller told dispatch, who then conveyed to Officer Hines, that the person about whom the caller had previously contacted police, i.e, the person with the flashlight, was inside of a vehicle located next to a vehicle owned by the caller's daughter. (Suppression Transcript, 7/26/18, N.T. 21-22, 36). The caller indicted that the person with the flashlight was located to the rear of the property. (Suppression Transcript, 7/26/18, N.T. 64).

30. The caller described his daughter's car as a red Nissan. (Suppression Transcript, 7/26/18, N.T. 22).

31. The caller described the car next to his or her daughter's red Nissan as a dark-colored "maybe . . . black" car. (Suppression Transcript, 7/26/18, N.T. 22, 29).

32. The caller told dispatch that he could see the flashlight inside of this dark-colored/black vehicle next to his daughter's red Nissan. (Suppression Transcript, 7/26/18, N.T. 23, 37).

6

33. The flashlight was described as a "phone flashlight". (Suppression Transcript, 7/26/18, N.T. 36-37).

34. The caller may have given dispatch a slight description of the cell phone flashlight operator, but at the Suppression Hearing Officer Hines could not remember what he said. (Suppression Transcript, 7/26/18, N.T. 37).

35. The caller did not tell dispatch that the flashlight operator was looking into cars, breaking into cars, or looking into the rear windows of houses. (Suppression Transcript, 7/26/18, N.T. 37).

36. Officer Hines was accompanied to the area this time by Officer Jared Davis of the Coatesville City Police Department. (Suppression Transcript, 7/26/18, N.T. 25, 55, 62, 64).

37. Officer Davis's jurisdiction of Coatesville borders Officer Hines's jurisdiction of Valley Township. (Suppression Transcript, 7/26/18, N.T. 56).

38. Officer Davis heard the second police dispatch to 44 South Park Avenue over police radio. (Suppression Transcript, 7/26/18, N.T. 56, 62). He also heard it over his MDC, or in-car computer. (Suppression Transcript, 7/26/18, N.T. 56). Officer Davis knew that the call which police dispatch had radioed out at 3:00 a.m. was the second call regarding a male with a flashlight to the rear of 44 Park Avenue. (Suppression Transcript, 7/26/18, N.T. 55). Officer Davis knew that Officer Hines had already gone to the area and checked it once. (Suppression Transcript, 7/26/18, N.T. 55). Officer Davis stated that he went to back up Officer Hines because Officer Hines typically works alone and the caller had given additional information this time. (Suppression Transcript, 7/26/18, N.T. 55, 64). Officer Davis took it upon himself to assist Officer Hines; Officer

7

Davis was not dispatched to assist Officer Hines. (Suppression Transcript, 7/26/18, N.T. 55-56). Officer Davis testified that he does not know whether there is any type of assistance agreement between Valley Township and the City of Coatesville; he stated that it is just the respective Departments' practice to back each other up. (Suppression Transcript, 7/26/18, N.T. 69).

39. It took Officer Davis less than five (5) minutes to respond to 44 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 56).

40. Officer Davis did not knock on the door of 44 South Park Avenue to gather any information from the caller directly regarding the person he observed with the flashlight in the rear of the property. (Suppression Transcript, 7/26/18, N.T. 63-64).

41. Officer Hines and Officer Davis returned to the area, parked their patrol cars on the road depicted in Exhibit D-1(D),[2] and walked up Newport Avenue to "almost like a lot" where they were "able to see the two vehicles." (Suppression Transcript, 7/26/18, N.T. 23, 40-41, 43, 46; 7/26/18, Ex. D-1(D).

42. Officer Davis recalled seeing a third vehicle there, but at the Suppression Hearing he could not recollect what it looked like. (Suppression Transcript, 7/26/18, N.T. 58).

43. The lot was located at the rear of number 44 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 23).

44. Officer Hines described the lot as an "open lot" right off of Newport Avenue.

---

[2] Officer Davis testified that the two Officers parked their vehicles on the road that runs in front of the properties, which suggests that the Officers parked on South Park Avenue; however, Officer Davis testified that he is not as familiar with the area as Officer Hines, because it is not his primary jurisdiction and he had in fact never been there before. (Suppression Transcript, 7/26/18, N.T. 56-57). Consequently, we credit Officer Hines's testimony with respect to where the Officers parked their patrol vehicles.

(Suppression Transcript, 7/26/18, N.T. 26-27).

45. Officer Davis described the area as follows.

> There's two alleyways that intersect and on the southeast corner of that intersection there's . . . grass and gravel that leads up to a chain link fence and that fence boxes in a rear backyard to one of the properties there.

(Suppression Transcript, 7/26/18, N.T. 58).

46. This lot was partially paved. (Suppression Transcript, 7/26/18, N.T. 33).

47. The "lot" that Officer Hines described is depicted in Exhibit D-1(G), with one section paved and the other section graveled. (Suppression Transcript, 7/26/18, N.T. 43, 65-66; Ex. D-1(G)).

48. Exhibit D-1(H) appears to be another picture of the lot without the fencing to the left shown. (7/26/18, Ex. D-1(H)).

49. Exhibit D-1(I) is another picture of the lot showing the fencing to the left, with an open gate, and some sheds in the back. (7/26/18, Ex. D-1(I)).

50. Exhibit D-1(J) appears to be a picture of a portion of the gravelly part of the lot with a shed to the rear and a fence and gate to the left. (7/26/18, Ex. D-1(J)).

51. Exhibit D-1(K) appears to be a picture of a portion of the gravelly part of the lot with the two sheds and a gated fence behind it. (7/26/18, Ex. D-1(K)).

52. Exhibit D-1(L) is another picture of the lot showing the fence and the gate behind it. (Suppression Transcript, 7/26/18, N.T. 47; 7/26/18, Ex. D-1(L)). The yard to which the gate depicted in Exhibit D-1(L) leads belongs to residence number 46 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 47-48).

53. There were no signs expressly indicating whether this lot was also utilized

9

by the residence at number 44 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 32-33).

54. There was no fencing or any other obstacles, such as hedges or trees, that would have interfered with the Officers' ability to see the vehicles parked in this lot. (Suppression Transcript, 7/26/18, N.T. 33; 7/26/18, Ex. D-1(G)).

55. When the Officers reached the lot, they were able to see the red vehicle and the dark vehicle from behind the rear of the vehicles. (Suppression Transcript, 7/26/18, N.T. 24). Officer Hines could not see into the dark-colored vehicle from the rear of the vehicles. (Suppression Transcript, 7/26/18, N.T. 46). Officer Davis described the red Nissan as a sedan. (Suppression Transcript, 7/26/18, N.T. 61).

56. Officer Hines testified that in the lot, the red Nissan was parked to the left of the dark-colored vehicle. (Suppression Transcript, 7/26/18, N.T. 27). Officer Hines testified that the vehicles were parked side-by-side. (Suppression Transcript, 7/26/18, N.T. 27). Officer Hines testified that they were parked facing the fence and the rear of the homes. (Suppression Transcript, 7/26/18, N.T. 43-45; 7/26/18, Ex. D-1(G)). Officer Hines indicated on Exhibit D-1(G) the direction and location of where the vehicles were parked. (Suppression Transcript, 7/26/18, N.T. 44-45; 7/26/18, Ex. D-1(G)). The road behind the lines drawn by Officer Hines on Exhibit D-1(G) is Newport Avenue. (Suppression Transcript, 7/26/18, N.T. 45; 7/26/18, Ex. D-1(G)).

57. Officer Davis described the vehicles as being parked facing the sheds with the red Nissan sedan parked in the middle of the three (3) vehicles he claims he saw. (Suppression Transcript, 7/26/18, N.T. 66-67). Officer Davis testified that the third car he observed was parked closest to the intersection of the two (2) alleyways he described

10

and would have been "third in line from the back of the residence." (Suppression Transcript, 7/26/18, N.T. 59). He testified that this third car was parked facing the road. (Suppression Transcript, 7/26/18, N.T. 66-67). Officer Davis could not recollect which car was parked nearest to the fence observed in Exhibit D-1(G). (Suppression Transcript, 7/26/18, N.T. 66). Officer Davis's account appears to place the dark-colored vehicle to the left of the red Nissan.

58. Although there are distinct and irreconcilable differences in the Officers' recollections regarding the placement of the cars in the lot, they are not material for purposes of this Opinion. Material to this Opinion is the fact that both Officers testified to observing the red Nissan sedan and the dark-colored SUV in this lot.

59. Officer Davis testified that the red Nissan sedan was not running as the Officers approached. (Suppression Transcript, 7/26/18, N.T. 61). He could not recall whether the dark-colored vehicle was running. (Suppression Transcript, 7/26/18, N.T. 61). He could not recall headlights being on with respect to either vehicle. (Suppression Transcript, 7/26/18, N.T. 61).

60. Officer Davis testified that he and Officer Hines were already on the side of the third vehicle when he "heard an individual or two talking behind" him. (Suppression Transcript, 7/26/18, N.T. 58-59, 68). Officer Davis alerted Officer Hines and the two (2) officers then "went over and made contact with the two occupants in the vehicle" from where Officer Davis had heard the conversation. (Suppression Transcript, 7/26/18, N.T. 58). Officer Davis instructed Officer Hines to take the driver's side approach and Officer Davis took the passenger's side. (Suppression Transcript, 7/26/18, N.T. 59). Officer

11

Davis walked to the rear of the vehicle, back out onto the street a little bit, and then made contact with the passenger. (Suppression Transcript, 7/26/18, N.T. 59).

61. Officer Hines walked up to the driver's side of the dark-colored vehicle. (Suppression Transcript, 7/26/18, N.T. 25).

62. Officer Davis described the dark-colored vehicle as an SUV. (Suppression Transcript, 7/26/18, N.T. 58).

63. As Officer Hines came up to the rear of the vehicle, he was able to observe that the front driver's seat was occupied by a male. (Suppression Transcript, 7/26/18, N.T. 25-26).

64. Officer Hines asked the front driver's side occupant what he was doing and asked him for identification. (Suppression Transcript, 7/26/18, N.T. 26).

65. The lighting in the vicinity was poor, consisting of possibly one porch light; it was "pretty dark." (Suppression Transcript, 7/26/18, N.T. 26, 37).

66. As Officer Hines approached the driver's side of the vehicle, Officer Davis approached the passenger's side. (Suppression Transcript, 7/26/18, N.T. 26).

67. As he approached the driver's side of the vehicle, Officer Hines was able to observe that the dark-colored vehicle had a passenger seated next to the front driver's side occupant. (Suppression Transcript, 7/26/18, N.T. 28-29).

68. Officer Davis, standing just outside of the passenger's side door of the vehicle, made contact with the passenger. (Suppression Transcript, 7/26/18, N.T. 66, 67).

69. Officer Davis asked the passenger whether he had any identification on him. (Suppression Transcript, 7/26/18, N.T. 60).

12

70. Officer Davis observed the passenger to be "kind of leaning down towards his right side putting pressure on his right forearm and towards the right side of his pants." (Suppression Transcript, 7/26/18, N.T. 60).

71. Officer Davis again asked the passenger for identification. (Suppression Transcript, 7/26/18, N.T. 60).

72. Officer Davis testified that he "believed [the passenger] was using a cell phone at the time, and he started to look for his ID." (Suppression Transcript, 7/26/18, N.T. 60). In the course of looking for his identification, the passenger switched hands with the cell phone, which took his right hand up off of his lap. (Suppression Transcript, 7/26/18, N.T. 60).

73. When the passenger moved his right hand up off of his lap, Officer Davis observed "the black in color handle of a firearm." (Suppression Transcript, 7/26/18, N.T. 60). Officer Davis testified that the barrel of the firearm was in the passenger's pants pocket and the handle was sticking up out of the pants pocket in his front right pocket. (Suppression Transcript, 7/26/18, N.T. 60).

74. As Officer Hines was talking to the front driver's seat occupant, Officer Hines overheard Officer Davis say to the front passenger seat occupant words to the effect of, "Do you have a license for that?" (Suppression Transcript, 7/26/18, N.T. 28).

75. Officer Davis either reached in through the open front passenger's side window or opened the door and he removed the firearm and put it on top of the vehicle's roof. (Suppression Transcript, 7/26/18, N.T. 60).

76. Officer Davis attempted to detain the Defendant. (Suppression Transcript, 7/26/18, N.T. 60-61).

77. The Defendant struggled with Officer Davis. (Suppression Transcript, 7/26/18, N.T. 61).

78. Upon hearing Officer Davis's query, "Do you have a license for that?", Officer Hines walked over to the passenger's side of the vehicle to assist Officer Davis. (Suppression Transcript, 7/26/18, N.T. 28).

79. Officer Hines observed Defendant in the front passenger's side seat area. (Suppression Transcript, 7/26/18, N.T. 28).

80. During the struggle between Officer Davis and the Defendant and while Officer Hines was coming around to aid Officer Davis, a bag of marijuana fell out from the passenger's side of the car. (Suppression Transcript, 7/26/18, N.T. 61).

81. Officer Davis identified Defendant in court as the person he observed in the front passenger's seat of the dark-colored SUV. (Suppression Transcript, 7/26/18, N.T. 59).

82. When Officer Hines reached the passenger's side of the vehicle, Officer Davis was taking the Defendant into custody. (Suppression Transcript, 7/26/18, N.T. 30).

83. Officer Hines was able to observe a gun on top of the vehicle when he reached the passenger's side. (Suppression Transcript, 7/26/18, N.T. 30-31).

84. In the course of arresting the Defendant, Officer Davis searched the Defendant's person. (Suppression Transcript, 7/26/18, N.T. 31).

85. As Officer Davis pulled the Defendant out of the vehicle, Officer Hines observed Officer Davis pat the Defendant down. (Suppression Transcript, 7/26/18, N.T. 31-32, 61).

14

86. Officer Davis's search of the Defendant's person yielded crack cocaine and liquid Hydrocodone. (Suppression Transcript, 7/26/18, N.T. 32, 61).

87. Neither the red Nissan sedan nor the third car that Officer Davis observed were occupied. (Suppression Transcript, 7/26/18, N.T. 61-62).

88. At some point Officer Davis ran the gun through NCIC. (Suppression Transcript, 7/26/18, N.T. 32).

89. Officer Hines then returned to the driver's side of the vehicle and patted down the driver. (Suppression Transcript, 7/26/18, N.T. 32).

90. Although Officer Hines did not know at the moment why Officer Davis was taking Defendant into custody, he later learned from Officer Davis that Officer Davis knew the Defendant and knew he was a felon for whom possession of a firearm was unlawful. (Suppression Transcript, 7/26/18, N.T. 31).

91. After Defendant was taken into custody, Officer Hines took the gun into his police cruiser and logged it into evidence. (Suppression Transcript, 7/26/18, N.T. 32).

92. Back at the police station, Officer Hines ran Defendant's name through NCIC and confirmed what Officer Davis had told him. (Suppression Transcript, 7/26/18, N.T. 31).

93. At the Suppression Hearing, defense counsel stipulated that Defendant is ineligible to possess a firearm. (Suppression Transcript, 7/26/18, N.T. 31).

94. At the Suppression Hearing, the defense presented witness Kimberly Mack, Defendant's girlfriend with whom Defendant has two biological children. (Suppression Transcript, 7/26/18, N.T. 71-72).

95. Ms. Mack lives at number 46 South Park Avenue in Chester County,

15

Pennsylvania. (Suppression Transcript, 7/26/18, N.T. 72-73). She rents the property from a landlord. (Suppression Transcript, 7/28/18, N.T. 73).

96. Ms. Mack testified that Defendant comes to 46 South Park Avenue every day and stays overnight at 46 South Park Avenue on average four (4) nights per week. (Suppression Transcript, 7/26/18, N.T. 73-74).

97. Ms. Mack testified that Defendant has a key to number 46 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 74).

98. Ms. Mack testified that Defendant does not have to call before he comes over to 46 South Park Avenue but is free to come and go as he pleases. (Suppression Transcript, 7/26/18, N.T. L74).

99. Ms. Mack testified that Defendant keeps clothing and a toothbrush at 46 South Park Avenue every day. (Suppression Transcript, 7/26/18, N.T. 75).

100. Ms. Mack testified that Exhibit D-1(A) depicts the front door to her home at 46 South Park Avenue as well as the front door of the adjoining home at 44 South Park Avenue, which she stated was her neighbors' house. (Suppression Transcript, 7/26/18, N.T. 76-77; 7/26/18, Ex. D-1(A)).

101. Ms. Mack testified that Exhibit D-1(B) is a picture of South Park Avenue "coming down". (Suppression Transcript, 7/26/18, N.T. 77; 7/26/18, Ex. D-1(B)).

102. Ms. Mack testified that Exhibit D-1(C) is a picture of South Park Avenue going down towards Race Alley. (Suppression Transcript, 7/26/18, N.T. 77; 7/26/18, Ex. D-1(C)).

103. Ms. Mack testified that Exhibit D-1(D) is a picture of Race Alley leading to

16

her backyard. (Suppression Transcript, 7/26/18, N.T. 77; 7/26/18, Ex. D-1(D)). She testified that the red brick building seen on the left of the Exhibit is her neighbor's house at 44 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 77; 7/26/18, Ex. D-1(D)).

104. Ms. Mack testified that Exhibit D-1(F) depicts Race Alley and the fenced-in yard of 44 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 78; 7/26/18, Ex. D-1(F)).

105. Ms. Mack testified that Exhibit D-1(G) is a close-up of her neighbor's yard at 44 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 78; 7/26/18, Ex. D-1(G)).

106. Ms. Mack testified that the area behind the fence depicted in Exhibit D-1(G) is her parking area; that is, it is the parking area for 46 South Park Avenue and does not belong to 44 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 78-79; 7/26/18, Ex. D-1(G)).

107. Ms. Mack testified that her landlord told her that the area behind the fence depicted in Exhibit D-1(G) belonged to 46 South Park Avenue, the property she rents. (Suppression Transcript, 7/26/18, N.T. 79).

108. Ms. Mack also testified that when she moved in her neighbor at number 44 South Park Avenue asked her if she would be parking in that area behind the fence depicted on Exhibit D-1(G), because her neighbor at number 44 South Park Avenue had a boat that he kept on that lot. (Suppression Transcript, 7/26/18, N.T. 79). She testified that she told her neighbor that she would be parking there and her neighbor subsequently removed his boat. (Suppression Transcript, 7/26/18, N.T. 79-80).

109. Ms. Mack testified that she and the Defendant park their cars in the area behind the fence depicted in Exhibit D-1(G). (Suppression Transcript, 7/26/18, N.T. 78-79; 7/26/18, Ex. D-1(G)).

110. Ms. Mack testified that Exhibit D-1(L) is another picture of her back parking lot. (Suppression Transcript, 7/26/18, N.T. 80). Exhibit D-1(L) depicts as well a rusty shed and a gate to the left of the shed. (Suppression Transcript, 7/26/18, N.T. 80; 7/26/18, Ex. D-1(L)). Ms. Mack testified that the gate and the shed are part of the property she rents at 46 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 80). She testified that the gate leads to her backyard, which leads to the back of her house as shown in Exhibit D-1(L) with the white siding. (Suppression Transcript, 7/26/18, N.T. 80; 7/26/18, Ex. D-1(L)).

111. Ms. Mack testified that she allows family and friends to park in the lot behind her house. (Suppression Transcript, 7/26/18, N.T. 80).

112. Ms. Mack testified that she keeps her lawn mower in the rusty shed depicted in Exhibit D-1(L) and that Defendant is the one who mows the lawn, including the grassy area in the parking lot, at her house. (Suppression Transcript, 7/26/18, N.T. 80-81).

113. Ms. Mack testified that both the paved portion and the gravel portion of the parking lot depicted on Exhibit D-1(G) belong to the property she rents at 46 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 81).

114. Ms. Mack testified that neither her neighbors at number 44 South Park Avenue nor the members of her neighbors' family park a vehicle in Ms. Mack's driveway. (Suppression Transcript, 7/26/18, N.T. 81-82).

18

115. Ms. Mack testified that she has never seen her neighbor's vehicle parked back there. (Suppression Transcript, 7/26/18, N.T. 82).

116. Ms. Mack testified that she was at home on the night of October 27-28, 2017 and that she did not observe a red Nissan parked in the lot depicted on Exhibit D-1(G). (Suppression Transcript, 7/26/18, N.T. 82).

117. Ms. Mack testified that she does not allow her neighbor to park in that lot without her permission. (Suppression Transcript, 7/26/18, N.T. 83).

118. Ms. Mack testified that there are no signs posted in the lot saying that the lot is the property of number 46 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 82).

119. Ms. Mack also testified that there is no fence around the lot depicted in Exhibit D-1(G). (Suppression Transcript, 7/26/18, N.T. 83).

120. At the conclusion of the Suppression Hearing, the Commonwealth objected to the admission of Defense Exhibits D-1(G) through D-1(L) on the grounds that the photographs in these Exhibits were taken during daylight hours and were not representative of the properties as they appeared to the Officers on the night of October 28, 2017. (Suppression Transcript, 7/26/18, N.T. 83-84).

121. We admitted Exhibits D-1(G) through D-1(L) over the Commonwealth's objection, with the caveat that we as a trial court, as opposed to a jury, would view these Exhibits with the understanding that the properties were not so clearly delineated to the Officers during the pre-dawn hours of October 28, 2017 as they appear in these Exhibits. (Suppression Transcript, 7/26/18, N.T. 84, 86).

19

122. At the Suppression Hearing, we also admitted Defense Exhibits D-1(A) through D-1(F), to which no objections were made by the Commonwealth. (Suppression Transcript, 7/26/18, N.T. 84).

123. The defense also introduced Exhibit D-2, an aerial photograph of the neighborhood including the home located at 46 South Park Avenue, taken from the Chester County website "Chester County Views", which is listed with a tax parcel number of UPL 385F-246. (Suppression Transcript, 7/26/18, N.T. 85; 7/26/18, Ex. D-2). The Commonwealth stipulated to its authenticity and admissibility. (Suppression Transcript, 7/26/18, N.T. 84-85).

124. We admitted Defense Exhibit D-2 with no objection from the Commonwealth. (Suppression Transcript, 7/26/18, N.T. 85-86).

125. The defense lastly introduced Exhibit D-3, the actual tax map pertaining to the properties of 44 and 46 South Park Avenue. (Suppression Transcript, 7/26/18, N.T. 85; 7/26/18, Ex. D-3). The Commonwealth stipulated to the authenticity and admissibility of this map. (Suppression Transcript, 7/26/18, N.T. 85).

126. We admitted Exhibit D-3 with no objection from the Commonwealth. (Suppression Transcript, 7/26/18, N.T. 85-86).

## II.   CONCLUSIONS OF LAW

1. Once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the Defendant's rights. *Commonwealth v. Carper*, 172 A.3d 613 (Pa. Super. 2017), *appeal denied*, 184 A.3d 540 (Pa. 2018).

20

2. The Fourth Amendment to the United States Constitution provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall be not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const., Amend. IV.

3. Article I, Section 8 of the Pennsylvania Constitution provides,

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const., Art. I, § 8.

4. The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures. *Commonwealth v. Milburn*, _____ A.3d _____, 2018 WL 3078669 (Pa. Super. 2018).

5. Warrantless searches and seizures are unreasonable *per se* unless conducted pursuant to a specifically established and well-delineated exception to the warrant requirement. *Commonwealth v. McCree*, 924 A.2d 621 (Pa. 2007); *Commonwealth v. Ayala*, 791 A.2d 1202 (Pa. Super. 2002).

6. To secure the rights of citizens to be free from intrusions upon his or her personal liberty, officers are required to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive.

21

*Commonwealth v. Milburn*, ___ A.3d ___, 2018 WL 3078669 (Pa. Super. 2018); *Commonwealth v. Ayala*, 791 A.2d 1202 (Pa. Super. 2002).

7. There are three cognizable categories of interactions between persons and police: a mere encounter, an investigatory detention, and a custodial detention or arrest. *Commonwealth v. Chase*, 960 A.2d 108 (Pa. 2008).

8. A mere encounter between a person and the police need not be supported by any level of suspicion and does not require a person to stop or respond. *Commonwealth v. Chase*, 960 A.2d 108 (Pa. 2008).

9. An investigatory detention, or *Terry* stop,[3] must be supported by reasonable suspicion; it subjects a person to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. *Commonwealth v. Chase*, 960 A.2d 108 (Pa. 2008).

10. An arrest or custodial detention must be supported by probable cause. *Commonwealth v. Chase*, 960 A.2d 108 (Pa. 2008).

11. The provision of the State Constitution protecting against unreasonable searches and seizures is the same as the Fourth Amendment for *Terry* purposes. *Commonwealth v. Chase*, 960 A.2d 108 (Pa. 2008).

12. The first issue which must be determined is whether Defendant was subjected to a seizure at the time the Officers approached his vehicle on both sides and began asking questions.

13. In evaluating the level of interaction between citizens and police, courts

---

[3] *See Terry v. Ohio*, 88 S.Ct. 1868 (U.S. Ohio 1968).

22

conduct an objective examination of the totality of the surrounding circumstances. *Commonwealth v. Lyles*, 97 A.3d 298 (Pa. 2014).

14. The standard to be used to determine if a seizure has occurred is an objective one, and this standard necessarily focuses on how a reasonable person would perceive a police officer's conduct and does not in any way consider the subjective intent of the purportedly seized person. *Commonwealth v. McClease*, 750 A.2d 320 (Pa. Super. 2000).

15. A seizure does not occur simply because a police officer approaches an individual and asks a few questions. *Commonwealth v. McClease*, 750 A.2d 320 (Pa. Super. 2000).

16. The totality of the circumstances test for determining the nature of a police-citizen encounter is ultimately centered on whether the suspect has in some way been restrained by physical force or show of authority. *Commonwealth v. Lyles*, 97 A.3d 298 (Pa. 2014).

17. Under the totality of the circumstances analysis of the interaction between police and a citizen, no single factors controls the ultimate conclusion as to whether a seizure occurred; to guide the inquiry, courts employ an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. *Commonwealth v. Lyles*, 97 A.3d 298 (Pa. 2014). *See also Commonwealth v. McClease*, 750 A.2d 320 (Pa. Super. 2000)(in determining whether particular police conduct constitutes an investigative detention, the focus of the court's inquiry is on whether a seizure of the person has occurred, and within this context, courts employ the following objective standard to discern whether a person has been

23

seized: whether, under all the circumstances surrounding the incident at issue, a reasonable person would believe he was free to leave).

18. If a reasonable person would not feel free to terminate an encounter with the police and leave the scene, then a seizure of the person has occurred. *Commonwealth v. Ayala*, 791 A.2d 1202 (Pa. Super. 2002).

19. What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs. *Commonwealth v. Lyles*, 97 A.3d 298 (Pa. 2014).

20. In the matter *sub judice*, the police did not just happen upon two people sitting in an automobile in the middle of the night. The police were called to the scene by police dispatch upon two reports by the same person, an hour apart, of an individual walking around the back of a residential property with a flashlight in the dark of night from 2:00 a.m. to 3:00 a.m. Their purpose in being at the back of numbers 44 and 46 South Park Avenue was patently investigative.

21. Upon hearing conversation in one of the vehicles to which they were directed by the person who called dispatch, the police moved to the sides of the vehicle from which the conversation was heard, one officer on the driver's side and one on the passenger's side.

22. Each Officer covered one side of the vehicle in the dark hours of nighttime for the purpose of investigating two reports, albeit from one caller, of a person walking behind the residence at number 44 South Park Avenue for a period from 2:00 a.m. to 3:00 a.m.

23. Although the Officers did not forcibly stop Defendant's vehicle, as it was already parked in the lot behind numbers 44 and 46 South Park Avenue, we find that they nevertheless subjected the Defendant to an investigative detention when they approached each side of the vehicle in which he was seated in the pre-dawn hours of the night and began to ask questions.

24. In assessing the totality of the circumstances, a request for identification does not in and of itself elevate what would otherwise be a mere encounter between police and citizens into an investigative detention. *Commonwealth v. Lyles*, 97 A.3d 298 (Pa. 2014).

25. An encounter between police and a citizen involving a request for identification may rise to a detention when coupled with circumstances of restraint of liberty, physical force, show of authority, or some level of coercion beyond the officer's mere employment, conveying a demand for compliance or that there will be tangible consequences from a refusal. *Commonwealth v. Lyles*, 97 A.3d 298 (Pa. 2014). *See also Commonwealth v. McClease*, 750 A.2d 320 (Pa. Super. 2000)(examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled).

26. In the matter *sub judice*, there were multiple police officers, one on each side of the car's doors, in the middle of the night specifically targeting Defendant and his companion for investigative purposes.

27. While no physical restraints were used upon the Defendant at this time,

25

it is apparent that a show of authority was applied in the multiple Officers' presence.

28. We find that a reasonable person would not have felt free to terminate the encounter between himself and the police under these circumstances and leave the scene. *See Commonwealth v. Barber*, 889 A.2d 587 (Pa. Super. 2005)(an investigative detention occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes; such a detention constitutes a seizure of the person and thus activates the protections of the Fourth Amendment).

29. An investigatory stop is justified only if the detaining officer can point to specific and articulable facts which, in conjunction with rational inference derived from those facts, give rise to a reasonable suspicion of criminal activity and therefore warrant the intrusion. *Commonwealth v. McClease*, 750 A.2d 320 (Pa. Super. 2000). *See also Commonwealth v. Ayala*, 791 A.2d 1202 (Pa. Super. 2002)(the police are permitted to stop and briefly detain citizens only when they have reasonable suspicion, based on specific and articulable facts, that criminal activity may be afoot).

30. In deciding whether reasonable suspicion exists for an investigatory detention, the fundamental inquiry is an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a person of reasonable caution in the belief that the action taken was appropriate. *Commonwealth v. Gray*, 784 A.2d 137 (Pa. Super. 2001).

31. The assessment of whether reasonable suspicion exists for an investigatory detention, like that applicable to the determination of probable cause, requires an evaluation of the totality of the circumstances, with a lesser showing needed

26

to demonstrate reasonable suspicion in terms of both quantity or content and reliability. *Commonwealth v. Gray*, 784 A.2d 137 (Pa. Super. 2001). *See also Commonwealth v. Milburn*, ___ A.3d ___, 2018 WL 3078669 (Pa. Super. 2018)(the assessment of whether reasonable suspicion exists for an investigatory detention requires an evaluation of the totality of the circumstances); *Commonwealth v. Riley*, 715 A.2d 1131 (Pa. Super. 1998), *appeal denied*, 737 A.2d 741 (Pa. 1999)(in determining whether a reasonable suspicion exists, the court must look to the totality of the circumstances).

32. Reasonable suspicion as is required to conduct an investigatory detention depends upon both the content of the information possessed by the police and its degree of reliability. *Commonwealth v. Milburn*, ___ A.3d ___, 2018 WL 3078669 (Pa. Super. 2018).

33. Reasonable suspicion as is required to conduct an investigatory detention is considerably less than proof of wrongdoing by a preponderance of the evidence. *Commonwealth v. Milburn*, ___ A.3d ___, 2018 WL 3078669 (Pa. Super. 2018).

34. Among the factors to be considered in establishing a basis for reasonable suspicion are tips, the reliability of the informants, time, location, and suspicious activity, including flight. *Commonwealth v. Milburn*, ___ A.3d ___, 2018 WL 3078669 (Pa. Super. 2018); *Commonwealth v. Gray*, 784 A.2d 137 (Pa. Super. 2001).

35. Other factors which may be considered in determining whether reasonable suspicion exists include various objective observations, information from police reports if such reports are available, and consideration of modes or patterns of

27

operation of certain kinds of lawbreakers. *Commonwealth v. Riley*, 715 A.2d 1131 (Pa. Super. 1998), *appeal denied*, 737 A.2d 741 (Pa. 1999).

36. While a tip can be a factor, an anonymous tip alone is insufficient as a basis for reasonable suspicion and such anonymous tips must be treated with particular suspicion. *Commonwealth v. Gray*, 784 A.2d 137 (Pa. Super. 2001).

37. Merely because a suspect's activity may be consistent with innocent behavior does not alone make detention and limited investigation illegal. *Commonwealth v. Riley*, 715 A.2d 1131 (Pa. Super. 1998), *appeal denied*, 737 A.2d 741 (Pa. 1999).

38. In determining whether a reasonable suspicion exists, the court views the circumstances through the eyes of a trained officer, not an ordinary citizen. *Commonwealth v. Milburn*, _____ A.3d _____, 2018 WL 3078669 (Pa. Super. 2018); *Commonwealth v. Riley*, 715 A.2d 1131 (Pa. Super. 1998), *appeal denied*, 737 A.2d 741 (Pa. 1999).

39. A combination of circumstances, none of which taken alone would justify an investigatory detention, may be sufficient to achieve reasonable suspicion. *Commonwealth v. Riley*, 715 A.2d 1131 (Pa. Super. 1998), *appeal denied*, 737 A.2d 741 (Pa. 1999).

40. To have reasonable suspicion for subjecting a citizen to an investigatory detention, police officers need not personally observe the illegal or suspicious conduct, but may rely upon the information of third parties, including tips from citizens; naturally if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. *Commonwealth v. Barber*, 889 A.2d 587 (Pa. Super. 2005).

28

41. Identified citizens who report their observations of criminal activity to police are assumed to be trustworthy, in the absence of special circumstances, for purposes of determining the existence of reasonable suspicion, since a known informant places himself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk. *Commonwealth v. Barber*, 889 A.2d 587 (Pa. Super. 2005).

42. While the reasonableness of official suspicion must be measured by what officers knew before they conducted their search, the law permits police to detain persons based upon a radio bulletin if evidence is offered at the suppression hearing to establish reasonable suspicion. *Commonwealth v. Barber*, 889 A.2d 587 (Pa. Super. 2005).

43. In the matter *sub judice*, Officers Hines and Davis received a police dispatch of a report from a known informant complaining about a person with a flashlight walking around the back of the residence at 44 South Park Avenue in the middle of the night. Officer Hines received the first report at 2:00 a.m. Both Officers heard the second report at 3:00 a.m. Officer Hines was able indirectly to communicate with the reporting party through dispatch.

44. Defense counsel suggests that walking at night with a flashlight is not a crime. However, walking, or standing, or loitering in the back of a residential property with a flashlight in the middle of the night for an hour or more is suspicious, whether or not it ultimately is criminal.

45. Further, Officer Hines described the area of South Park Avenue as not

"nice", with rundown and possibly abandoned rowhomes. He testified that he knows other officers who have made arrests in that area.

46. With regard to the factors set forth in *Commonwealth v. Riley*, 715 A.2d 1131 (Pa. Super. 1998), *appeal denied*,737 A.2d 741 (Pa. 1999), the Officers were able, when they responded to the second, more detailed dispatch, to confirm the presence of the vehicles described by the caller and the presence of persons in one of those vehicles, one of whom was operating a cell phone flashlight. Their observations confirmed the description of events and persons as provided by the known informant.

47. No police reports were introduced into evidence.

48. As we noted earlier, Officer Hines testified that the area to which he was dispatched is not a nice one, and he knows other officers who have made arrests in that area. Although no one testified as to the modes or patterns of operation of lawbreakers in the area, it is not beyond common knowledge that houses are often broken into during the night.

49. Under the totality of the circumstances, including the reliability of the tip, the location of the suspect activity, the time of the night, the fact that the reporting party called not once but twice over the span of an hour, and the unusual nature of the activity reported, we find that the Officers acted appropriately and reasonably in investigating the report and that there was reasonable suspicion to justify the investigatory detention of the Defendant.

50. While lawfully detaining Defendant for investigative purposes, Officer Davis asked Defendant for identification.

51. Officer Davis stood outside of the passenger's side of the vehicle in which Defendant was sitting, which was parked in the partially paved, partially graveled driveway behind numbers 44 and 46 South Park Avenue.

52. Police officers have the authority to enter the curtilage of private property for the purpose of conducting an investigation. *Commonwealth v. Eichler*, 133 A.3d 775 (Pa. Super. 2016), *reargument denied* (April 1, 2016), *appeal denied*, 161 A.3d 791 (Pa. 2016), *dismissal of post-conviction relief aff'd*, 2018 WL 4171141 (Pa. Super. 2018).

53. When police come on to private property to conduct an investigation and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment. *Commonwealth v. Eichler*, 133 A.2d 775 (Pa. Super. 2016), *reargument denied* (April 1, 2016), *appeal denied*, 161 A.3d 791 (Pa. 2016), *dismissal of post-conviction relief aff'd*, 2018 WL 4171141 (Pa. Super. 2018)(*quoting* La Fave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 2.3(f) (5th Ed.)(database updated October 2015)).

54. Defendant has not argued that he is entitled to greater protection in this respect under Pennsylvania law than is provided under the Federal Constitution, nor have we found any authority supporting such a proposition.

55. Accordingly, we find that Officer Davis was standing in a place he was lawfully permitted to be at the time he was questioning the Defendant.

31

56. When Defendant moved his hand while looking for his requested identification, Officer Davis was able to observe the handle of a gun protruding from the Defendant's pants pocket.

57. The "plain view" doctrine permits the warrantless seizure of evidence observed in plain view when (1) the officer views the object from a lawful vantage point and (2) it is immediately apparent to him that the object is incriminating. *Commonwealth v. Ballard*, 806 A.2d 889 (Pa. Super. 2002).

58. In determining whether the incriminating nature of an object is immediately apparent to the police officer, as would support the application of the plain view doctrine to the warrantless seizure of the object, the court looks to the totality of the circumstances. *Commonwealth v. Ballard*, 806 A.2d 889 (Pa. Super. 2002).

59. The police officer's belief that the object in plain view is incriminating must be supported by probable cause in order for the plain view doctrine to apply to allow the warrantless seizure of the object. *Commonwealth v. Ballard*, 806 A.2d 889 (Pa. Super. 2002).

60. Officer Davis has personal knowledge of the Defendant and knows that he is not eligible to be licensed to carry a firearm.

61. Thus, when Officer Davis observed the firearm on Defendant's person, it was immediately apparent to him that the firearm was incriminating.

62. Officer Davis was therefore permitted to retrieve the weapon and place it on the top of the vehicle in which Defendant was sitting.

63. Probable cause for a warrantless arrest exists if the facts and circumstances within the officer's knowledge at the time of arrest are sufficient to justify a

32

person of reasonable caution in believing the suspect has committed or is committing a crime. *Commonwealth v. Burnside*, 625 A.2d 678 (Pa. Super. 1993).

64. To determine whether probable cause for a warrantless arrest existed, the court will consider the totality of the circumstances as they appeared to the arresting officer, and the court will focus on the circumstances as seen through the eyes of a trained officer and not view the situation as the average citizen might. *Commonwealth v. Burnside*, 625 A.2d 678 (Pa. Super. 1993).

65. The standard of probable cause for a warrantless arrest is only the probability, and not a *prima facie* showing, of criminal activity. *Commonwealth v. Burnside*, 625 A.2d 678 (Pa. Super. 1993).

66. Probable cause for a warrantless arrest exists when criminality is one reasonable inferences and it need not be the only, or even the most likely, inference; the determination of probable cause must be based on a common-sense, nontechnical analysis. *Commonwealth v. Burnside*, 625 A.2d 678 (Pa. Super. 1993).

67. Given Officer Davis's personal knowledge of the Defendant and his observation of the illegal firearm, Officer Davis, upon viewing that firearm, had probable cause to arrest Defendant for violating 18 Pa. C.S.A. § 6105(a)(1) (Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms) and 18 Pa. C.S.A. § 6106(a)(1)(Firearms Not to Be Carried Without a License).

68. As Officer Davis was attempting to arrest the Defendant, the Defendant physical struggled with Officer Davis. In the course of that struggle, a bag containing marijuana fell to the ground from the passenger's side of the vehicle where the Defendant had been sitting.

33

69. Officer Davis observed that immediately apparent bag of marijuana in plain view from a lawful vantage point.

70. Officer Davis lawfully seized the bag of marijuana which he observed in plain view from a lawful vantage point.

71. In the course of his arrest of the Defendant, Officer Davis patted the Defendant down and discovered crack cocaine and liquid Hydrocodone.

72. Both the Pennsylvania and the United States Constitutions permit a police officer to search an arrestee's person and the area in which the person is detained in order to prevent the arrestee from obtaining weapons or destroying evidence. *Commonwealth v. Simonson*, 148 A.3d 792 (Pa. Super. 2016), *appeal denied*, 169 A.3d 33 (Pa. 2017).

73. The "search incident to arrest" exception to the warrant requirement allows arresting officers, in order to prevent the arrestee from obtaining a weapon or destroying evidence, to search both the person arrested and the area within his immediate control. *Commonwealth v. Simonson*, 148 A.3d 792 (Pa. Super. 2016), *appeal denied*, 169 A.3d 33 (Pa. 2017).

74. A warrantless search incident to arrest is valid only if it is substantially contemporaneous with the arrest. *Commonwealth v. Simonson*, 148 A.3d 792 (Pa. Super. 2016), *appeal denied*, 169 A.3d 33 (Pa. 2017).

75. The search incident to arrest exception to the warrant requirement applies categorically and permits a search of the arrestee's person as a matter of course without a case-by-case adjudication of whether a search of a particular arrestee is likely

s:\admin\sarcione\Hurd Lawrence Suppression.docx

to protect officer safety or evidence. *Commonwealth v. Simonson*, 148 A.3d 792 (Pa. Super. 2016), *appeal denied*, 169 A.3d 33 (Pa. 2017).

76. A search conducted immediately prior to arrest is as valid as a search conducted subsequent and incident to the arrest provided the officer had probable cause to arrest the subject prior to the search and as long as the contraband discovered in the search is not used as justification or probable cause for the arrest. *Commonwealth v. Trenge*, 451 A.2d 701 (Pa. Super. 1982).

77. Here, Officer Davis's search of the Defendant was conducted substantially contemporaneously with Defendant's arrest and Defendant's arrest was supported by probable cause independent of anything discovered during Officer Davis's search of Defendant's person.

78. Officer Davis conducted a valid search incident to arrest of the Defendant's person.

79. Additionally, during an investigatory stop, police may briefly detain individuals and frisk for weapons when there is reasonable suspicion that criminal activity is afoot. *Commonwealth v. McCree*, 924 A.2d 621 (Pa. 2007).

80. Officer Davis, upon observing the firearm protruding from Defendant's pants pocket and based upon his prior knowledge of the Defendant and the Defendant's ineligibility to lawfully possess a firearm, had the requisite reasonable suspicion to believe that Defendant was armed and dangerous and therefore was lawfully allowed to frisk the Defendant in the course of his investigatory detention of the Defendant. *See Commonwealth v. Jackson*, 698 A.2d 571 (Pa. 1997)(to justify a frisk incident to an

35

investigatory stop, the police need to point to specific and articulable facts indicating that person they intend to frisk may be armed and dangerous).

81. Officer Davis's lawful pat-down of the Defendant's person, as we noted above, yielded crack cocaine and liquid Hydrocodone.

82. Officer Davis was lawfully entitled to seize these items, as their incriminating nature under the totality of the circumstances was immediately apparent.

83. Upon observation of the crack cocaine and liquid Hyrdocodone, Officer Davis had probable cause to arrest the Defendant for the drug offenses listed in the Information.

84. Under Pennsylvania Rule of Criminal Procedure 502(2), Officer Davis had the authority to arrest the Defendant without a warrant for the Felonies and Misdemeanor listed in the Information.

85. The investigatory detention, search and arrest of the Defendant and the recovery of all of the contraband discovered were lawful under the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.

86. Because the interaction between Officer Davis and the Defendant was lawful, there is no basis upon which to order the suppression of the evidence recovered during that interaction.

87. Accordingly, we enter the following Order.

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

vs. : CHESTER COUNTY, PENNSYLVANIA

LAWRENCE HURD : NO. 15-CR-0001284-2018

: CRIMINAL ACTION—LAW

*Thomas Ost-Prisco, Esquire, for the Commonwealth*
*Thomas F. Burke, Esquire, for the Defendant*

## O R D E R

AND NOW, this _13th_ day of September 2018, upon consideration of the Defendant's counseled Omnibus Pre-Trial Motion in the form of a Motion for the Suppression of Evidence, filed June 14, 2018, and counseled Motion to Suppress Physical Evidence, filed June 21, 2018, the Commonwealth's response thereto, the evidence adduced at a hearing held on July 26, 2018, and the arguments of able counsel, it is hereby **ORDERED AND DECREED** that said Motions are **DENIED** and **DISMISSED**.

BY THE COURT:

_____
Anthony A. Sarcione,                                    J.

37