2016 PA Super 207

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RONALD SIMONSON, | |
| Appellant | No. 598 WDA 2015 |

Appeal from the Judgment of Sentence of October 29, 2014
In the Court of Common Pleas of Allegheny  County
Criminal Division at No(s): CP-02-CR-0004237-2010

BEFORE:  OLSON, STABILE AND MUSMANNO, JJ.:

OPINION BY OLSON, J.:                    **FILED SEPTEMBER 12, 2016**

Appellant, Ronald Simonson, appeals from the judgment of sentence entered on October 29, 2014, as made final by the denial of Appellant's post-sentence motion on March 12, 2015.  We affirm.

In February 2010, Appellant was arrested and charged with attempted homicide, aggravated assault, and firearms not to be carried without a license.[1]  On March 21, 2011, Appellant filed an omnibus pre-trial motion. Within this motion, Appellant claimed that, following his arrest, the police performed a warrantless gunshot residue test on his hands.  Appellant's First Suppression Motion, 3/21/11, at 1-5.  Appellant claimed that the Fourth Amendment to the United States Constitution and Article I, Section 8 of the

---

[1] 18 Pa.C.S.A. §§ 901(a), 2702(a)(1), and 6106(a)(1), respectively.

Pennsylvania Constitution mandated that the results of the gunshot residue test be suppressed, as "there was no search warrant and no exigency existed that would enable a warrantless search" for gunshot residue on his hands. *Id.*

On March 31, 2011, the trial court held a hearing on Appellant's motion to suppress. During this hearing, City of Pittsburgh Police Detective Harry Lutton testified that, at approximately 8:30 p.m. on February 9, 2010, he received a call that shots had been fired in the Greenway housing project. N.T. Suppression Hearing, 3/31/11, at 4-5. Uniformed police officers informed Detective Lutton that they apprehended Appellant "a matter of blocks away from the scene" and that Appellant matched the description of the shooter. *Id.* at 5. Detective Lutton also learned that the victim, Bradley Cohen, was shot twice, was taken to the hospital, and was in critical condition and that "a shell casing and a bullet fragment" were recovered from the scene. *Id.* at 6.

That night, detectives in the homicide unit presented a photographic array to the victim and to two witnesses at the scene; all individuals identified Appellant as the shooter. *Id.* at 6-7. Detective Lutton testified that, after the victim and the witnesses identified Appellant as the shooter, Appellant was placed under arrest. *Id.* at 7.

City of Pittsburgh Police Detective Blase Kraeer testified that, following Appellant's arrest, he performed a gunshot residue test on Appellant's hands. *Id.* at 11. As Detective Kraeer testified, to perform the post-arrest

gunshot residue test upon Appellant, the detective "[took] a swab[] and [he] swab[bed] four different parts of the two hands." *Id.* Detective Kraeer testified that the swab had a "sticky substance" that he just "brush[ed] against the hand" and that the test did not "use any liquid." *Id.* Daniel Wolfe, an employee of the Allegheny County Medical Examiner's Office, testified that a gunshot residue test is generally necessary to detect such residue because gunshot residue particles are "the size of a micron" and are not "readily apparent to the naked eye." *Id.* at 19.

Detective Kraeer testified that, after he swabbed Appellant's hands, he forwarded the kit to the Allegheny County Crime Lab – and the crime lab then performed "the actual [laboratory] testing" for gunshot residue. *Id.* at 15. As Mr. Wolfe testified, he analyzed the kit that Detective Kraeer submitted and the analysis demonstrated a "positive result for gunshot residue." *Id.* at 18.

Regarding temporal considerations surrounding gunshot residue tests, Mr. Wolfe testified that a gunshot residue swab must be performed "[a]s quickly as possible" following the suspected discharge of the firearm because:

> the particulate material, when it exits the firearm, is not adhesive by nature. It lands on the surface. You start to slough those materials off through activity, interaction with your hands, pants, placing your hands in your pockets. If you wash your hands, all of that – the more activity that takes place after the incident, the less likely you are to find particles.

*Id.*

Mr. Wolfe testified that "bagging the hands" of a living individual[2] would not necessarily preserve gunshot residue on that person's hands. Mr. Wolfe testified:

> there is still activity. The bag could interact with the surface of the individual's hands, and that acts the same as a pocket or your trouser pants would. The more interaction with the surface, the more obstruction you have.

*Id.* at 19. However, Mr. Wolfe noted that, "[a]s far as the hands in the bag thing, the gunpowder could come off, the particles could come off in the bags" and that he would then "have to examine the entire bag in addition to the hands." *Id.* at 20.

At the conclusion of the hearing, the trial court denied Appellant's suppression motion on the record. *Id.* at 24.

Thereafter, as the trial court explained:

> [On April 4, 2011, a] jury was empaneled [and Appellant's trial began. However,] on April 5, 2011, [the trial court] declared a mistrial. Appellant moved to bar retrial on the basis of double jeopardy, which [the trial court] denied on August 9, 2011. The Superior Court of Pennsylvania affirmed [the trial court's] order on June 21, 2012.

_____

[2] Detective Lutton testified that the police will routinely place bags over the hands of "an individual that is [dead on arrival]. They do that so that the [gunshot residue] doesn't get knocked off, washed off while they place the [deceased] person in a bag and then take them to the Coroner's Office." N.T. Suppression Hearing, 3/31/11, at 9. However, as Detective Kraeer testified, "the bagging of the hands . . . is not done with [living] suspects." *Id.* at 13-14.

> [***Commonwealth v. Simonson***, 53 A.3d 937 (Pa. Super.
> 2012) (unpublished memorandum) at 1-14].

Trial Court Opinion, 10/15/15, at 2.

On remand, Appellant's case was reassigned to a different trial court judge and the case proceeded to trial.[3] At the conclusion of the trial, the jury found Appellant guilty of aggravated assault and carrying a firearm without a license; the jury found Appellant not guilty of attempted homicide. On October 29, 2014, the trial court sentenced Appellant to serve an aggregate term of 72 to 160 months in prison, followed by three years of probation.

Following the denial of Appellant's post-trial motion, Appellant filed a timely notice of appeal. Appellant raises one issue on appeal:

> Whether the suppression court erred by failing to suppress the results of the gunshot residue evidence when the police without a warrant seized particles from Appellant's hands?

Appellant's Brief at 5.

"Once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's

---

[3] On September 23, 2013, Appellant filed another pre-trial motion. The motion claimed that the trial court must suppress certain statements he made to law enforcement. Appellant's Second Suppression Motion, 9/23/13, at 1-3. Within his second suppression motion, Appellant did not reiterate his earlier suppression claim that the gunshot residue test constituted an unreasonable search of his person. ***See id.***

rights." ***Commonwealth v. Wallace***, 42 A.3d 1040, 1047-1048 (Pa. Super. 2012) (*en banc*); ***see also*** Pa.R.Crim.P. 581(H). With respect to an appeal from the denial of a motion to suppress, our Supreme Court has declared:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record. . . . Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

***Commonwealth v. Eichinger***, 915 A.2d 1122, 1134 (Pa. 2007) (internal citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." ***Commonwealth v. Gallagher***, 896 A.2d 583, 585 (Pa. Super. 2006).

On appeal, Appellant claims that the trial court erred when it denied his motion to suppress the results of the gunshot residue test.[4] According to

---

[4] As noted, prior to Appellant's first trial, Appellant claimed that the results of the gunshot residue test must be suppressed, as "there was no search warrant and no exigency existed that would enable a warrantless search" for gunshot residue on Appellant's hands. Appellant's First Suppression Motion, 3/21/11, at 1-5. Appellant did not repeat or renew this claim in the suppression motion he filed prior to his second trial. ***See*** Appellant's Second Suppression Motion, 9/23/13, at 1-3. Nevertheless, by raising the "gunshot residue test" claim in his first suppression motion, Appellant preserved the
*(Footnote Continued Next Page)*

Appellant, the police committed an unreasonable search when they swabbed his hands for gunshot residue. Specifically, Appellant claims, the search was unreasonable because it was performed without a warrant and without exigent circumstances. Appellant's Brief at 19-24. Further, with respect to the claim that the search was performed without exigent circumstances, Appellant relies upon the United States Supreme Court's recent opinion in *Missouri v. McNeely*, ___ U.S. ___, 133 S.Ct. 1552 (2013), where the High Court held that the natural metabolization of alcohol in the bloodstream does not present a *per se* exigency and that, "consistent with Fourth Amendment principles, [] exigency in [drunk-driving cases] must be determined case by case based on the totality of the circumstances." *Id.* at 1556 and 1558.

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

claim for appeal, as the facts and law relevant to the suppression motion were identical prior to both trials. *Commonwealth v. Jones*, 858 A.2d 1198, 1204 (Pa. Super. 2004) (defendant preserved his claim that the trial court erred when it failed to sever the criminal charges filed against him when defendant raised the claim in the pre-trial motion that he filed prior to his second trial; although the second trial ended in a mistrial and the defendant "did not raise the severance issue prior to his third trial," the issue was preserved for appellate review because "the ruling prior to the second trial was binding on the [trial] court during the third trial;" specifically, this Court held: "[t]he [severance] ruling was determinative of the law of the case[, as] . . . the facts warranting severance of the charges were identical prior to both the second and third trials . . . [and] there [had not] been a change in legal authority"); *see also Commonwealth v. Henderson*, 520 A.2d 1372 (Pa. 1987) (holding that the denial of a pre-trial suppression motion was entitled to collateral estoppel effect, where the motion was raised again during the defendant's retrial and the defendant did not "allege[] new evidence not previously available").

In Appellant's view, **McNeely** demands that we vacate his conviction because, in this case, the trial court simply applied a "categorical rule" that the warrantless, post-arrest gunshot residue test constituted a reasonable search under the Fourth Amendment. **See** Appellant's Brief at 23-24. According to Appellant, the police had time to secure a warrant in this case and, if the police feared the destruction of evidence, the police could have "bagged" his hands until they obtained the warrant. **Id.** Appellant's claim fails.

"The Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from unreasonable searches and seizures." **Commonwealth v. McAdoo**, 46 A.3d 781, 784 (Pa. Super. 2012). "A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies." **Commonwealth v. Strickler**, 757 A.2d 884, 888 (Pa. 2000). "Exceptions to the warrant requirement include the consent exception, the plain view exception, the inventory search exception, the exigent circumstances exception, the automobile exception . . . , the stop and frisk exception, and the search incident to arrest exception." **Commonwealth v. Dunnavant**, 63 A.3d 1252, 1257 n.3 (Pa. Super. 2013).

In the case at bar, the Commonwealth does not dispute Appellant's claim that a search occurred when the police performed the post-arrest gunshot residue test upon Appellant's hands. **See** Commonwealth's Brief at

16-26; *see also Commonwealth v. Blasioli*, 685 A.2d 151, 156 (Pa. Super. 1996) ("the taking of saliva from an individual by a police officer constitutes a search under the Fourth Amendment of the United States Constitution and Article I, § 8 of the Pennsylvania Constitution"); *Cupp v. Murphy*, 412 U.S. 291, 295 (1973) (taking a "fingernail scraping" from an individual constitutes a search under the Fourth Amendment); *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616-617 (1989) (subjecting a person to a breathalyzer test constitutes a search under the Fourth Amendment); *but see Commonwealth v. DeWitt*, 314 A.2d 27, 31 (Pa. Super. 1973) (*en banc*) ("the use of [an] ultraviolet light to examine defendants' hands [to determine the presence of fluorescent grease] did not amount to a search"). As such, for purposes of this appeal, we will assume that the gunshot residue test constituted a search. The current appeal thus centers around one question: whether the search was constitutionally reasonable. *See Riley v. California*, ___ U.S. ___, 134 S.Ct. 2473, 2482 (2014) ("[a]s the text [of the Fourth Amendment] makes clear, the ultimate touchstone of the Fourth Amendment is 'reasonableness'") (some internal quotations omitted). The answer to this question is dependent upon whether the search falls within a specific exception to the warrant requirement. *Strickler*, 757 A.2d at 888.

On appeal, Appellant bases much of his claim for relief upon the United States Supreme Court's opinion in *McNeely*. *See* Appellant's Brief at 20-24. *McNeely* was solely concerned with the exigent circumstances exception to

the warrant requirement. *McNeely*, 133 S.Ct. at 1556. We express no opinion on whether the search in this case falls under the exigent circumstances exception because, as we will explain below, the search was reasonable as a search incident to arrest.[5]

As the United States Supreme Court has explained:

> The search-incident-to-arrest doctrine has an ancient pedigree. Well before the Nation's founding, it was recognized that officers carrying out a lawful arrest had the authority to make a warrantless search of the arrestee's person. An 18th-century manual for justices of the peace provides a representative picture of usual practice shortly before the Fourth Amendment's adoption:
>
>> "[A] thorough search of the felon is of the utmost consequence to your own safety, and the benefit of the public, as by this means he will be deprived of instruments of mischief, and evidence may probably be found on him sufficient to convict him, of which, if he has either time or opportunity allowed him, he will besure [sic] to find some means to get rid of." The Conductor Generalis 117 (J. Parker ed. 1788) (reprinting S. Welch, Observations on the Office of Constable 19 (1754)).
>
> One Fourth Amendment historian has observed that, prior to American independence, "[a]nyone arrested could expect that not only his surface clothing but his body, luggage, and saddlebags would be searched and, perhaps, his shoes, socks, and mouth as well." W. Cuddihy, The Fourth Amendment: Origins and Original Meaning: 602–1791, p. 420 (2009).

_____

[5] Given our disposition, *McNeely* does not control the outcome of this case and, as such, we will not discuss *McNeely* further.

No historical evidence suggests that the Fourth Amendment altered the permissible bounds of arrestee searches. On the contrary, legal scholars agree that "the legitimacy of body searches as an adjunct to the arrest process had been thoroughly established in colonial times, so much so that their constitutionality in 1789 can not be doubted." *Id.* at 752.

*Birchfield v. North Dakota*, ___ U.S. ___, 136 S.Ct. 2160, 2174-2175 (2016) (some internal quotations and citations omitted).[6]

The search incident to arrest exception allows "arresting officers, in order to prevent the arrestee from obtaining a weapon or destroying evidence, [to] search both the person arrested and the area within his immediate control."[7] *Id.* at 2175 (internal quotations omitted); *Chimel v. California*, 395 U.S. 752, 763 (1969). Moreover, in contrast to the exigent

---

[6] Appellant does not claim that Article I, Section 8 of the Pennsylvania Constitution affords him greater protection than that provided under the Fourth Amendment to the United States Constitution. Appellant's Brief at 12-24. Moreover, both the Pennsylvania and United States Constitutions permit "a police officer [to] search the arrestee's person and the area in which the person is detained in order to prevent the arrestee from obtaining weapons or destroying evidence." *Commonwealth v. White*, 669 A.2d 896, 902 (Pa. 1995).

[7] We note that "[a] warrantless search incident to an arrest is valid 'only if it is substantially contemporaneous with the arrest.'" *Commonwealth v. Wright*, 742 A.2d 661, 665 (Pa. 1999), *quoting Shipley v. California*, 395 U.S. 818, 819 (1969); *see also United States v. Edwards*, 415 U.S. 800, 803 (1974) ("it is also plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention"). In the case at bar, Appellant never claimed that the challenged search occurred at a time that was too remote to constitute a search incident to arrest. As such, we will not discuss the temporal limits to the exception.

circumstances exception, the search incident to arrest exception applies categorically.  In other words, the search incident to arrest exception permits a search of the arrestee's person as a matter of course – and without a "case-by-case adjudication . . . [of] whether a search of a particular arrestee is likely to protect officer safety or evidence." ***Birchfield***, 136 S.Ct. at 2176 (internal quotations and emphasis omitted).

Review of United States Supreme Court and Pennsylvania case law reveals no opinion that passes upon the question of whether the particular gunshot residue test employed in this case – or, indeed, any type of gunshot residue test – constitutes a reasonable search incident to arrest.  Therefore, as the United States Supreme Court has held:

> [a]bsent more precise guidance from the founding era, we generally determine whether to exempt a given type of search from the warrant requirement by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.

***Riley***, 134 S.Ct. at 2484 (internal quotations and citations omitted).

The founding era provides this Court with no guidance on whether the gunshot residue swab test, as employed in the case at bar, is exempted from the warrant requirement.[8]  Therefore, this Court must "assess[], on the

---

[8] Within Pennsylvania case law, the earliest reference to a gunshot residue test that this Court was able to discover was in the 1936 Pennsylvania Supreme Court opinion **Commonwealth v. Westwood**, 188 A. 304 (Pa. *(Footnote Continued Next Page)*

one hand, the degree to which [the test] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* (internal quotations and citations omitted).

We first examine "the degree to which [the gunshot residue swab test] intrudes upon an individual's privacy." With respect to this concern, we initially note that, when the gunshot residue swab test was performed upon

*(Footnote Continued)* ───────────────

1936). In that opinion, the *Westwood* Court described a "paraffin test." The *Westwood* Court described the paraffin test in the following manner:

> [During the defendant's murder trial, t]he Commonwealth offered expert testimony to the effect that there were particles of partially burned gunpowder on the defendant's right hand near and back of his index and ring finger. Shortly after [the victim] was shot . . . Assistant County Detective Monaghan made a "paraffin test" of defendant's right hand and his own right hand. . . . Hot paraffin was placed next to the skin. Cotton was placed on that and then another coat of paraffin added. The paraffin was then lifted. These "moulds" were labeled, wrapped up and taken to the district attorney's office. They were later subjected by two chemists, Dr. Muehlberger and F. C. Buckmaster, to the "diphenylamine test" or so-called "lungee reaction." This was described as "a reaction primarily for nitrates and [certain] other oxidized substances, a standard test known for possibly fifty to seventy-five years."

*Westwood*, 188 A. at 307. However, *Westwood* Court did not consider the question of whether application of the test subjected the defendant to an unreasonable search.

Appellant, Appellant was under a lawful arrest.[9]  As the United States Supreme Court has held, "[t]he expectations of privacy of an individual taken into police custody necessarily are of a diminished scope." *Maryland v. King*, ___ U.S. ___, 133 S.Ct. 1958, 1978 (2013) (internal quotations, citations, and brackets omitted).  Thus, at the time of the search, Appellant's reasonable expectation of privacy was already curtailed.

Second, the physical intrusion in this case was negligible.  *See Birchfield*, 136 S.Ct. at 2176.  To be sure, Detective Kraeer testified that he merely "[took] a swab[] and [he] swab[bed] four different parts of [Appellant's] two hands."  As Detective Kraeer testified, the swab had a "sticky substance" that he just "brush[ed] against the hand" and the test did not "use any liquid."  The test was thus quick, non-invasive, and innocuous – and far less intrusive than a breathalyzer test (which requires the defendant to insert a "straw-like mouthpiece" into his mouth and "blow continuously for [four] to 15 seconds"), a buccal swab test (which requires another individual to rub a swab on the inside of a defendant's cheek), or a fingernail scrape (which requires another individual to scrape the inside of the defendant's fingernails).  Moreover, with respect to the breathalyzer, buccal swab, and fingernail scrape, the United States Supreme Court has characterized the

_____

[9] Appellant does not contest the fact that, when the gunshot residue test was performed, he was under a lawful arrest that was supported by probable cause.

- 14 -

scope of the intrusions as, respectively: an "almost negligible" physical intrusion; a "negligible" physical intrusion; and, a "very limited intrusion." *Birchfield*, 136 S.Ct. at 2177; *King*, 133 S.Ct. at 1969; *Cupp*, 412 U.S. at 296; *see also Commonwealth v. Cross*, 496 A.2d 1144, 1150 (Pa. 1985) (upholding the "warrantless seizure of [an arrestee's] hair samples and [] fingernail clippings and scrapings" as valid incident to arrest because "their seizure was so minor an imposition as to constitute only the slightest intrusion, if indeed such constituted an intrusion").

Third, the gunshot residue test is "capable of revealing only one bit of information:" the presence of gunshot residue on the swab. *See Birchfield*, 136 S.Ct. at 2177. To paraphrase the United States Supreme Court:

> In this respect, [the gunshot residue test] contrast[s] sharply with the sample of cells collected by the swab in *Maryland v. King*. Although the DNA obtained under the law at issue in that case could lawfully be used only for identification purposes, 133 S.Ct. at 1967-1968, the process put into the possession of law enforcement authorities a sample from which a wealth of additional, highly personal information could potentially be obtained.

*Birchfield*, 136 S.Ct. at 2177.

In contrast to the DNA collection and testing at issue in *King*, here, the gunshot residue swab merely allowed the police to "pick up particulate material from the surface of the hands or whatever surface you are collecting it from." *See* N.T. Suppression Hearing, 3/31/11, at 17 and 18. Further, the later, laboratory testing was focused solely upon determining

the presence or absence of one foreign substance: gunshot residue. *See id.*

Finally, application of the gunshot residue swab "is not an experience that is likely to cause any great enhancement in the embarrassment that is inherent in any arrest." *Birchfield*, 136 S.Ct. at 2177. Certainly, it cannot be said that the limited application of a dry, sticky swab upon Appellant's hands enhanced Appellant's embarrassment in any significant manner.

Therefore, we conclude that the gunshot residue swab and test in this case did not "implicate significant privacy concerns." *Id.* at 2178 (internal quotations, citations, and corrections omitted).

We must next assess "the degree to which [the gunshot residue test] is needed for the promotion of legitimate governmental interests." *Riley*, 134 S.Ct. at 2484 (internal quotations and citations omitted). As to this element, we need not engage in a long discussion on the Commonwealth's vital interests in identifying, arresting, and prosecuting individuals who have unlawfully discharged a firearm, shot at another individual, or shot an individual. Arguably, the two paramount interests of the Commonwealth are ensuring the public safety and welfare. The gunshot residue test promotes these interests by identifying individuals who might have unlawfully discharged a firearm or who might have harmed or murdered another person – and then preserving the evidence for trial.

Therefore, we conclude that the gunshot residue test has a negligible intrusion upon an individual's privacy and that it serves an important

function in promoting vital governmental interests. As such, we conclude that the gunshot residue test constitutes a reasonable search incident to arrest. Moreover, since the search incident to arrest exception applies categorically – and not on a case-by-case basis – Appellant's claims that the police "had time" to obtain a warrant and that the police "could have 'bagged' the hands of Appellant until a warrant was obtained," necessarily fail.

In the case at bar, the police validly subjected Appellant to a gunshot residue test incident to his arrest. The search was thus reasonable and the trial court properly denied Appellant's motion to suppress.[10]

_____

[10] We note our decision aligns with those of our sister states and federal courts that have considered the issue. *See*, *e.g.*, *Jones v. State*, 74 A.3d 802, 813 (Md.App. 2013) ("we conclude that the [gunshot residue] evidence was properly collected in the course of a reasonable search incident to [the defendant's] lawful arrest, for which no warrant was required"); *Sen v. State*, 301 P.3d 106 (Wy. 2013) ("in light of the minimal intrusion caused by the swab for gunshot residue and the easy destructibility of such evidence, administration of the gunshot residue test was a valid search incident to arrest"); *People v. Allen*, 875 N.E.2d 1221, 1228 (Ill.App. 2007) ("[b]ecause the hand swabbing was so minor an imposition that the defendant suffered no true humiliation or affront to his dignity, we find a search warrant was not required to justify the [gun shot residue] test after defendant was in custody") (internal quotations omitted); *United States v. Johnson*, 445 F.3d 793, 795-796 (5th Cir. 2006) ("[b]ecause the presence of gun powder on his hands was relevant evidence that Johnson (or merely time) could have eventually removed or destroyed, if his arrest was valid, the performance of the gun powder residue test was lawful, and the admission of the results at trial was proper"); *State v. Beasley*, 70 P.3d 463, 466 (Ariz. 2003) ("the search of the defendant's person by swabbing for gunshot residue after arrest was reasonable"); *State v. Kyger*, 787 S.W.2d 13, 21 (Tenn. Crim. App. 1989) ("[b]ecause officers had probable cause for the warrantless arrest, there is no merit to the argument that

*(Footnote Continued Next Page)*

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/12/2016

---

*(Footnote Continued)* ————————————

officers could not gather the physical evidence acquired from [the defendant's] person[; h]andswabs, fingerprints and photographs are admissible as evidence legally obtained pursuant to [the defendant's] arrest"); **State v. Riley**, 500 S.E.2d 524 (W.Va. 1997) (holding that the warrantless "swabb[ing of the defendant's] hands and face for traces of gunpowder residue" constituted a reasonable search incident to arrest); **Strickland v. State**, 275 S.E.2d 29 (Ga. 1981) ("[s]wabbing the hands of an accused to lift gunshot residue does not constitute an unconstitutional search or seizure"); **State v. Parsons**, 513 S.W.2d 430, 441 (Mo. 1974) (swabbing the defendant's hands for traces of nitroglycerine was reasonable incident to his lawful arrest for the bombing death of his wife); **see also Ray v. State**, 803 S.W.2d 894, 899 (Ark. 1991) (holding that the warrantless gunpowder residue test was "reasonable in light of exigent circumstances").