NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4554-18T4

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

TREY I. LENTZ,

    Defendant-Respondent.

_____

APPROVED FOR PUBLICATION

March 16, 2020

APPELLATE DIVISION

Argued November 20, 2019 – Decided  March 16, 2020

Before Judges Koblitz, Gooden Brown and Mawla.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 18-07-0971.

Monica Lucinda do Outeiro, Assistant Prosecutor, argued the cause for appellant (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Monica Lucinda do Outeiro, of counsel and on the brief).

Margaret Ruth McLane, Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Margaret Ruth McLane, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

By leave granted, the State appeals from the May 14, 2019 Law Division order granting defendant's motion to suppress gunshot residue (GSR) evidence swabbed from his hands without a warrant following his arrest. We reverse.

I.

Defendant was charged in a six-count indictment with first-degree attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3; second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); fourth-degree aggravated assault by pointing a firearm, N.J.S.A. 2C:12-1(b)(4); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and fourth-degree obstruction, N.J.S.A. 2C:29-1. The State's proofs included GSR swabbed from defendant's hands during a warrantless search following his arrest on an unrelated arrest warrant preliminarily indicating he recently fired a gun. Prior to trial, defendant moved to suppress the GSR evidence. At the ensuing testimonial hearing, Monmouth County Sheriff's Officer Jason Simeone and Monmouth County Crime Scene Unit Detective Steven Vogt testified for the State.

Simeone, a member of the Warrant Fugitive Unit, testified that on May 6, 2018, he had an "active case" open for defendant based on an outstanding "Superior Court" arrest warrant issued on April 2, 2018. Although Simeone previously received "information . . . that [defendant] was staying" at a

residence on Ridge Avenue in Asbury Park (the Ridge Avenue residence), Simeone was waiting for the "right amount of man[]power" before acting on the information because of concerns that "[defendant] was an active gang member," and "might have a weapon." That opportunity presented itself when Simeone received a "mutual aid call" for assistance at approximately 1:00 p.m. on May 6, stemming from an "anonymous" 911 call that there were "shots fired" and the suspected shooter was seen running into the Ridge Avenue residence. Simeone, his partner, and three other sheriff's officers promptly responded to the call.

Upon arriving at the scene at about 1:10 p.m., Simeone and the other responding officers, including officers from both Asbury Park and Neptune Police Departments, learned that three males possibly involved in the shooting had entered the Ridge Avenue residence, prompting the officers to "set up a perimeter" and "secure[]" the residence. After receiving consent to enter from one of the occupants of the residence, the officers entered and apprehended two individuals on the first floor, and a third who had climbed out onto the roof from an upstairs window but returned inside upon the officers' commands. Once he climbed back into the residence, Simeone identified the male as defendant from the photograph in "[the arrest] warrant packet," "handcuffed" him, and placed him under arrest at approximately 2:40 p.m.

Although defendant was arrested pursuant to the arrest warrant, "he was [also] a suspect in the shooting" because "[a]s he was being led away from the scene," an officer was informed by "another witness . . . that defendant was the shooter." As a result, in addition to being handcuffed "behind his back," "plastic bags" were placed "over his hands," and "taped at the wrist" to preserve GSR evidence and "keep [defendant] from essentially rubbing his hands." Defendant did however have "the ability to grasp things" because the bags were only partially "inflated" and the taping of his wrists "was [not] particularly tight." Defendant was then transported to Asbury Park police headquarters "for processing."[1]

Vogt, who had been trained in "crime scene investigation," "shooting analysis and reconstruction," as well as "collection, [and] documentation of evidence," first became involved in the shooting investigation when he "responded to the Jersey Shore University Medical Center" at approximately 2:43 p.m. "to document and recover evidence [from] the [shooting] victim" who was being treated for three gunshot wounds. At 3:58 p.m., Vogt arrived at the Ridge Avenue residence "in order to photographically document the scene as well as . . . collect[] . . . any potential evidence." Based upon his

---

[1] At headquarters, two other occupants of the Ridge Avenue residence also identified defendant as the shooter during questioning.

"recovery of ballistics" at the scene, including "a .25 caliber casing," Vogt determined that "a semi[-]automatic pistol was used."[2]

At 5:10 p.m., Vogt arrived at Asbury Park police headquarters to test defendant's hands for potential traces of GSR. Vogt confirmed that the plastic bags placed over defendant's hands would preserve any GSR evidence either on defendant's hands or in the bags themselves. Vogt explained that GSR is "essentially . . . unburnt gunpowder" consisting of "minute amounts of metal" "comprised of lead, antimony and barium." According to Vogt,

> when a firearm is fired, that explosion . . . within the gun will expel [GSR] in a couple different areas. One would be out [of] the barrel, which is going to exit the barrel at somewhat of a cone shape. Two would be the ejection port of the handgun, as the casing is ejected out of the handgun. . . . And lastly, . . . out [of] the slide. So as the slide comes backwards, [GSR] is also going to basically come back as well towards the shooter.

Vogt stated that GSR emitted from the slide of the gun was "particularly relevant in this case" because that was the part "of a semi[-]automatic handgun" where the GSR "would come backwards." However, Vogt explained that GSR "is extremely fragile," "can dissipate very easily," and can simply be "wash[ed]" or "wip[ed]" away. According to Vogt, ninety percent of GSR will

---

[2]  Subsequently, a weapon was recovered from the basement of the Ridge Avenue residence.

 A-4554-18T4

"dissipate within the first hour" after a shooter fires a gun, and, when dealing with "a small caliber casing" as here, which produces "less [GSR]" to begin with, there was potentially even less evidence of GSR on the shooter's hands "several hours later."

To administer the test on defendant's hands, Vogt used "a binary [GSR] test kit," involving "two aspects," neither of which was "very invasive" because it was performed "[o]nly on the surface [of] the hands" and required no "piercing of the skin." Vogt explained that "[t]he first [component] entails stubbing the hands using a plastic vial . . . with a cap on it. Upon removal of the cap, there is an adhesive surface, similar to . . . Scotch tape." Once the cap is removed, the vial is "dabb[ed] . . . on the webs of [the] hands, on the front and back of [the] hands." This process is repeated "a total of six [times] . . . , three on one hand and three on the other," after which the vial is "preserved" for subsequent laboratory testing.

According to Vogt, "the second component . . . of the test kit is a presumptive field test" whereby a "gauze pad is . . . wiped very gently over the hands and placed in a small . . . clear plastic container, [at] which time a liquid reagent is dropped onto it." The purpose of the liquid reagent is to reveal the presence of "nitrates[,] specifically, nitrocellulose." Vogt explained that if "blue or black specks" appear on the gauze pad "within about five minutes or

so," as occurred here, it is considered "a positive test," indicating that a "gun was recently fired" by the person whose hands were swabbed. However, because this type of test was not definitive, in order to obtain confirmatory lab results, typically, "the stubs" from the first component of the test would be "sent out to the lab for further testing."[3]

Prior to administering the test on defendant, Vogt learned from another detective that defendant would not consent to the test. Vogt called a Monmouth County assistant prosecutor for "advice" on whether to conduct the test without a search warrant over defendant's objection. Given the dissipation rate of GSR and the time that had already elapsed since the shooting, the assistant prosecutor advised Vogt not "to wait . . . to get a search warrant" because "there were sufficient exigent circumstances" to "justify[] proceeding without a warrant." Accordingly, Vogt conducted the test in accordance with his testing protocol at approximately 5:40 p.m.

Following the hearing, in a written decision, the judge granted the suppression motion. Preliminarily, finding Vogt's and Simeone's testimony "honest and straightforward," and the facts "in large part uncontested," the judge made factual findings consistent with their testimony. The judge "noted

---

[3] Because the New Jersey State Police Lab does not perform the requisite confirmatory testing, the State deferred the expense involved in utilizing a private lab pending the outcome of the appeal.

that no New Jersey authority [had] addresse[d] the specific issues presented in th[e] case," and posited that the issues were whether "swabbing a suspect's hands for [GSR was] considered a search," and if so, whether such a search "may . . . be permissibly conducted during a search incident to a valid arrest."

Ultimately, "guided by prior analogous authority," the judge determined that "the taking of exemplars from a suspect's body for subsequent testing constitutes a search under the Fourth Amendment of the United States Constitution and Article [I], Paragraph 7 of the New Jersey Constitution." Thus, the judge concluded that "Vogt indeed conducted a search when he swabbed defendant's hands for [GSR]." The judge reasoned that "[t]he act of collecting a sample from defendant's hands for purposes of testing clearly amount[ed] to an intrusion – no matter how minimal" and "without the subject's consent, that intrusion involved some degree of force."

Next, the judge determined that because "defendant was validly arrested on the outstanding arrest warrant," it would have been permissible for officers to "conduct[] a valid search incident to arrest at or near the scene when they arrested defendant at [the Ridge Avenue residence]." However, because "defendant was transported away from the [site] of his arrest to . . . [p]olice [h]eadquarters before his hands were swabbed for [GSR]," and "[a] significant amount of time [had] passed, over two and one half . . . hours, between the

time . . . defendant was arrested and when his hands were swabbed," "the State . . . failed to establish by a preponderance of the evidence that the search of defendant's hands for [GSR] was sufficiently contemporaneous and proximate to his arrest . . . to qualify as a search incident to arrest."

The judge also stressed "that the police had ample opportunity to obtain a warrant before taking exemplars from defendant's hands," noting "there was no threat posed by defendant once he was in custody, and there was minimal, if any risk that evidence would be lost or destroyed in the time it would take to get a warrant" given the "steps [taken by police] to preserve any evidence." In that regard, the judge distinguished State v. Oyenusi, 387 N.J. Super. 146 (App. Div. 2006). The judge reasoned that "[i]n Oyenusi, police were arguably unsure what evidence was contained in the luggage seized, and what steps were required to preserve whatever was present," but in this case, "police knew what kind of evidence they sought and they knew how to preserve it." The judge expounded that "[h]aving taken the time to telephone an assistant prosecutor, there was ample time . . . to obtain a telephonic warrant as there arguably existed probable cause to have a warrant issued."

The judge concluded that while "[GSR] may very well be lawfully collected during a search incident to a valid arrest," "the totality of the

circumstances present here remove[d] this search from within the bounds of that exception to the warrant requirement." The judge stated

> Here, the warrantless search of defendant was unlawful where no threat to officer safety existed[,] . . . the evidence sought was being preserved, and the search took place at a time and place apart from that of defendant's arrest. . . .
>
> Therefore, because detectives did not obtain a warrant and no exception to the warrant requirement applie[d],[4] the search of defendant's hands was unreasonable. . . . Suppression of the [GSR] evidence is warranted because police and the assistant prosecutor could have and should have obtained a warrant before searching defendant. They clearly had the opportunity and the obligation to so do in the absence of circumstances that would have justified a warrantless search.

## II.

On appeal, the State argues the judge made "two fatal errors" in granting defendant's suppression motion. First, the judge "fail[ed] to apply the entirety of [our] decision in <u>Oyenusi</u> to the facts of this case." The State submits in <u>Oyenusi</u>, we "adopted the rule of <u>United States v. Edwards</u>, 415 U.S. 800, 807

---

[4] Although the State did not rely on "the exigent circumstances exception to the warrant requirement," for the sake "of completeness," the judge rejected its applicability, explaining that there were no exigent circumstances because "police waited over two and one half . . . hours to collect the sample from defendant's hands," and once defendant was "handcuffed" with his hands "behind his back and . . . plastic bags [placed] over [his] hands . . . , the threat that evidence of [GSR] would be lost was all but eliminated."

(1974)[], which upholds as valid a search incident to arrest that 'is not conducted contemporaneously with the arrest.'" The State contends that the judge's "finding – that the passage of two and a half hours and change in location was too long and too remote to sustain the hand swabbing as a search incident to arrest – stands in direct conflict with Oyenusi and Edwards." Secondly, the State asserts the judge impermissibly "engraft[ed]" an additional "requirement onto the test for a valid search incident to arrest: the inability to obtain a search warrant." According to the State, "[n]o requirement of such exigency has ever been applied to the search incident to arrest exception in this State." The State submits the judge "fell into the trap of evaluating not the reasonableness of what the police did here, but instead evaluating what [he] believed the police could have, [and] should have done."

While our review of the trial court's factual findings, informed by its first-hand assessment of the credibility of the witnesses, is limited, "[w]e owe no deference . . . to conclusions of law made by trial courts in deciding suppression motions, which we instead review de novo." State v. Brown, 456 N.J. Super. 352, 358-59 (App. Div. 2018) (citing State v. Watts, 223 N.J. 503, 516 (2015)). See State v. Boone, 232 N.J. 417, 425-26 (2017) ("An appellate court reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the trial court's decision, provided that those

A-4554-18T4

findings are 'supported by sufficient credible evidence in the record.'" (quoting State v. Scriven, 226 N.J. 20, 40 (2016))); State v. Gamble, 218 N.J. 412, 424-25 (2014) ("Deference to these factual findings is required because those findings 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964))). Because the judge's factual findings, which are largely uncontested, are supported by sufficient credible evidence in the record, we focus our review on the judge's legal conclusions.

Applying our de novo standard of review to those conclusions, "[w]e review this appeal in accordance with familiar principles of constitutional law." State v. Robinson, 228 N.J. 529, 543 (2017). As the motion judge correctly pointed out, preliminarily, we must decide whether Vogt's swabbing of defendant's hands for GSR constitutes a search under applicable constitutional doctrines. "[W]here, as here, the [g]overnment seeks to obtain physical evidence from a person, the Fourth Amendment may be relevant . . . ." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616 (1989) (citing United States v. Dionisio, 410 U.S. 1, 8 (1973)). Because "[t]he integrity of an individual's person is a cherished value of our society," Schmerber v. California, 384 U.S. 757, 772 (1966), "[o]btaining and examining . . . evidence

[from a person's body] may . . . be a search, if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable." Skinner, 489 U.S. at 616 (internal citations omitted); see also State v. Linton, 356 N.J. Super. 255, 258 (App. Div. 2002) (explaining that "[a] search . . . only 'occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.'" (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984))).

In that regard, it is well settled that an intrusion into the body for a blood sample for testing of alcohol content is a search, Schmerber, 384 U.S. at 766-67, as is a "cheek swab for the purposes of obtaining a DNA sample." State v. O'Hagen, 189 N.J. 140, 149 (2007) (quoting Skinner, 489 U.S. at 616-17). Likewise, submitting a breath sample for chemical analysis to measure alcohol level is a search. California v. Trombetta, 467 U.S. 479, 481 (1984). When it comes to a person's hands, in Cupp v. Murphy, 412 U.S. 291 (1973), the Court held that the police obtaining "fingernail scrapings" from a suspect was a "search" that "went beyond mere physical characteristics . . . constantly exposed to the public, and constituted the type of severe, though brief, intrusion upon cherished personal security that is subject to constitutional scrutiny." Id. at 294-95 (alteration in original) (citations and internal quotation marks omitted). But see United States v. Richardson, 388 F.2d 842, 845 (6th

13

Cir. 1968) (holding that examination of the defendant's hands for evidence of incriminating fluorescent powder was not a search within Schmerber, 384 U.S. at 772).

Here, we agree with the motion judge that Vogt's swabbing of defendant's hands for GSR was a search under the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution because it intruded upon a reasonable expectation of privacy. Over his objection, defendant's hands were repeatedly "stubb[ed]" or touched with a vial that had a slightly adhesive surface, and then swabbed with a gauze pad. Thus, the process "went beyond 'mere physical characteristics . . . constantly exposed to the public'" and constituted a forceful "though brief intrusion upon cherished personal security." Cupp, 412 U.S. at 295 (alteration in original) (quoting Dionisio, 410 U.S. at 14).

Next, we examine the validity of the search. "Both the United States Constitution and the New Jersey Constitution guarantee an individual's right to be secure against unreasonable searches or seizures." State v. Minitee, 210 N.J. 307, 318 (2012) (citing U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7). "[S]earches and seizures conducted without warrants issued upon probable cause are presumptively unreasonable and therefore invalid." State v. Elders, 192 N.J. 224, 246 (2007) (citing State v. Pineiro, 181 N.J. 13, 19 (2004)).

Exceptions exist to "the general requirement that a warrant be obtained prior to a search, but if a warrantless search is challenged, the State bears the burden of establishing by a preponderance of the credible evidence that the search fits within the scope of one of those exceptions." Minitee, 210 N.J. at 318 (citing State v. Wilson, 178 N.J. 7, 12-13 (2003)). The exception germane to this appeal is the search incident to arrest exception.

"[T]he search incident to arrest exception to the warrant requirement was limned for two specific purposes—the protection of the police and the preservation of evidence . . . ." State v. Eckel, 185 N.J. 523, 524 (2006). To that end, the exception allows "the arresting officer to search" both "the arrestee's person and the area 'within his immediate control'" in order to prevent the arrestee from obtaining a weapon or destroying evidence. Chimel v. California, 395 U.S. 752, 763 (1969). While questions abound about the permissible geographical area beyond the person of an arrestee that may be lawfully searched, "no doubt has been expressed as to the unqualified authority of the arresting authority to search the person of the arrestee." United States v. Robinson, 414 U.S. 218, 225 (1973).

Indeed, "[t]he authority to search the person incident to a lawful custodial arrest," although "based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the

15

probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." Id. at 235. Instead, because a lawful "custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment[,] . . . a search incident to the arrest requires no additional justification," and the mere "fact of the lawful arrest which establishes the authority to search" justifies "a full search of the person." Ibid.

While a search incident to a lawful arrest is permissible, the "exception . . . is not limitless in terms of purpose or scope." State v. Dangerfield, 171 N.J. 446, 461 (2002). First and foremost, ordinarily, "[a] search incident to an arrest must be contemporaneous with that arrest." State v. Bradley, 291 N.J. Super. 501, 510 (App. Div. 1996). An arrest and search are deemed to be "reasonably contemporaneous" if "they occur as parts of a single transaction, as connected units of an integrated incident." State v. Doyle, 42 N.J. 334, 343 (1964). Further, as with all searches, a search incident to arrest must be reasonable. Fundamentally, "[w]hether a search is reasonable under the Fourth Amendment 'depends on [the totality] of the circumstances surrounding the search . . . and the nature of the search . . . itself.'" O'Hagen, 189 N.J. at 149 (quoting Skinner, 489 U.S. at 619). "In making that determination, the [c]ourt balances the 'intrusion on the individual's Fourth Amendment interests against

A-4554-18T4

[the] promotion of legitimate governmental interests.'" Ibid. (second alteration in original) (quoting Skinner, 489 U.S. at 619).

In Oyenusi, although we acknowledged the "requirement that the search be 'substantially contemporaneous' with the arrest," we noted that "a search incident to an arrest may be valid under some circumstances even though it is not conducted contemporaneously with the arrest." 387 N.J. Super. at 155-56. In that regard, we relied on Edwards, 415 U.S. at 807, where the United States Supreme Court "upheld the validity of the seizure and subsequent search of clothing taken from an arrestee in jail approximately ten hours after his arrest." Oyenusi, 387 N.J. Super. at 156 (emphasis added). We acknowledged, however, that "such a delayed search incident to an arrest may be made only of items that are 'immediately associated with the person,' such as a purse or wallet," or "clothing" as was the case in Edwards. Oyenusi, 387 N.J. Super. at 156 (quoting Curd v. City Court, 141 F.3d 839, 842-44 (8th Cir. 1998)).[5]

---

[5]  In Oyenusi, we applied the search incident to arrest exception to "the contents of a container in the possession of an arrestee" notwithstanding the fact that "the arrestee no longer ha[d] access to the container when the search [was] conducted." Id. at 150. The arrestee, the defendant's brother and co-defendant in a Medicaid fraud indictment, was arrested pursuant to an unrelated arrest warrant while "carrying two white plastic bags." Id. at 151. Upon executing the warrant, the arresting officers "took the bags . . . and then looked inside." Ibid. One of the bags contained "a notebook, blank prescription pads, Medicaid eligibility cards under various names, and some prescriptions ostensibly written by doctors," evidence that was "subsequently

17                                                                          A-4554-18T4

In Edwards, the Court recognized as settled law that "searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." 415 U.S. at 803. There, the defendant was lawfully arrested and in custody in a jail cell "[w]hen it became apparent that the articles of clothing [he was wearing] were evidence of the crime for which [he] was being held." Id. at 806. The Court found it was "reasonable to take and examine [his clothing] as the police did, particularly in view of the existence of probable cause linking the clothes to the crime." Ibid.

The Court determined

> once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other.
>
> [Id. at 807.]

used by the State to prove [the] defendant's involvement in the Medicaid fraud scheme" that was the subject of the indictment. Ibid. We concluded that the search was "a valid search incident to an arrest under both the Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution." Id. at 150.

The Court explained "it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest." Id. at 806.  The Court noted that "[w]hile the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in . . . evidence."  Id. at 808-09 (quoting United States v. DeLeo, 422 F.2d 487, 493 (1st Cir. 1970)).  See Oyenusi, 387 N.J. Super. at 159 ("[E]xcept for its rejection of the Belton rule,[6] our Supreme Court generally has not 'afforded greater protection regarding the scope of a search incident to a lawful arrest under our State Constitution than that provided in Chimel's interpretation of the Fourth Amendment.'" (quoting Dangerfield, 171 N.J. at 462)).

Whether the delayed search exception promulgated in Edwards and adopted in Oyenusi should be extended to permit the swabbing of an arrestee's hands for GSR is an issue of first impression in New Jersey.  While not binding on this court, other states have considered the admissibility of GSR

---

6  New York v. Belton, 453 U.S. 454, 460 (1981) (holding "that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.") (footnote omitted).

evidence under the search incident to arrest exception to the warrant requirement and have upheld its validity. In Jones v. State, 74 A.3d 802 (Md. Ct. Spec. App. 2013), after analyzing numerous "[o]pinions of the appellate courts of . . . sister States" as well as "Federal precedents," the Maryland Court of Special Appeals held that "the warrantless collection of GSR evidence from an individual whom the police have probable cause to believe has recently fired a gun in the course of committing a crime, does not violate the Fourth Amendment's prohibition against unreasonable searches and seizures." Id. at 501.

In Jones, the arrestee's hands were swabbed at the police station forty-five minutes after his arrest for attempted murder and weapons possession related charges. Id. at 491. The court concluded "the GSR evidence was properly collected in the course of a reasonable search incident to [the defendant's] lawful arrest," id. at 503, and reasoned that given "[t]he limited intrusion," id. at 501 "it [was] entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." Id. at 503 (quoting United States v. Johnson, 445 F.3d 793, 795 (5th Cir. 2006)).

Likewise, in Commonwealth v. Simonson, 148 A.3d 792 (Pa. Super. Ct. 2016), the Pennsylvania Court of Appeals affirmed the trial court's denial of

the defendant's motion to suppress GSR evidence seized from his hands without a warrant following his arrest. Id. at 801. After assuming that the seizure of GSR evidence from the defendant's hands constituted a search, the court assessed "on the one hand, the degree to which [the test] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Id. at 799-800 (alteration in original) (quoting Riley v. California, 573 U.S. 373, 385 (2014)).

As to the privacy concerns, first, the court concluded that because the GSR swab test was performed upon the defendant while "[he] was under a lawful arrest," his "reasonable expectation of privacy was already curtailed." Id. at 800. "Second, the physical intrusion" which, as here, involved "swab[ing] four different parts" of the defendant's "'two hands'" with "a 'sticky substance'" that was "just 'brush[ed] against the hand,'" was "quick, non-invasive, and innocuous — and far less intrusive than a breathalyzer test . . . , a buccal swab test . . . , or a fingernail scrape." Ibid. (second alteration in original).

Third, "in contrast to the DNA collection and testing at issue in [Maryland v. King, 569 U.S. 435, 442-43 (2013)]," "the [GSR] test is 'capable of revealing only one bit of information:' the presence of [GSR] on the swab." Simonson, 148 A.3d at 800-01. "Finally, application of the [GSR] swab 'is not

an experience that is likely to cause any great enhancement in the embarrassment that is inherent in any arrest.'" Id. at 801 (quoting Birchfield v. North Dakota, 136 S. Ct. 2160, 2177, 195 L.Ed.2d 560, 579-80 (2016)). Thus, the court concluded "that the [GSR] swab and test . . . did not 'implicate significant privacy concerns.'" Ibid. (quoting Birchfield, 136 S. Ct. at 2178).

Turning to the governmental interests, the court noted "the two paramount interests of . . . ensuring the public safety and welfare" were promoted "by identifying individuals who might have unlawfully discharged a firearm or who might have harmed or murdered another person — and then preserving the evidence for trial." Ibid. Finding "that the [GSR] test has a negligible intrusion upon an individual's privacy and that it serves an important function in promoting vital governmental interests," the court concluded "that the [GSR] test constitute[d] a reasonable search incident to arrest," and rejected the defendant's "claims that the police 'had time' to obtain a warrant and that the police 'could have "bagged" the [defendant's] hands . . . until a warrant was obtained.'" Ibid.

Similarly, in People v. Allen, 875 N.E.2d 1221 (Ill. App. Ct. 2007), the Illinois Appeals Court affirmed the trial court's denial of the defendant's motion to suppress the results of a GSR test administered by the police following the defendant's arrest for an unrelated attempted robbery. Id. at

1223, 1228. There, on the same day that a detective planned to arrest the defendant on an attempted robbery committed about one month earlier, the detective learned of a second attempted robbery that occurred at the same location. Id. at 1223-24. As a result, after arresting the defendant for the first robbery as planned, the detective transported him to the police station where "an atomic absorption [GSR] test [was] performed on [the] defendant's hands" in connection with the second robbery, the results of which were later admitted at the trial leading to the convictions that were the subject of the appeal. Id. at 1224-25.

The court analyzed the warrantless search under the search incident to arrest exception, and concluded that "a search warrant was not required to justify the GSR test after defendant was in custody" for the first robbery, given the fact that, at the time, "the arresting officers were assigned to investigate the [second] attempt[ed] robbery." Id. at 1228. Finding that "the police were authorized to detain [the] defendant," the court determined "[i]n light of the circumstances . . . the hand swabbing was not an unreasonable search and seizure." Id. at 1225, 1228. On the contrary, "[t]he hand swab . . . was a minor intrusion, no more offensive than fingerprinting or photographing," and for which the defendant "suffered no true humiliation or affront to his dignity." Id. at 1228 (quoting United States v. D'Amico, 408 F.2d 331, 333 (2d Cir.

A-4554-18T4

1969)).  See also Johnson, 445 F.3d at 795-96 (holding that the warrantless administration of a GSR test performed following a warrantless arrest based on probable cause was proper as incident to that arrest under Chimel, 395 U.S. at 763 "[b]ecause the presence of gun powder on [the defendant's] hands was relevant evidence that [the defendant] (or merely time) could have eventually removed or destroyed").

Applying these principles, we balance the intrusion of GSR testing on an individual's privacy against promoting vital governmental interests, and conclude that if an individual is lawfully arrested and in police custody, a delayed search of the arrestee's person for GSR evidence is constitutionally permissible under the search incident to arrest exception as long as the delay itself and the scope of the search are objectively reasonable.  Here, given the existence of probable cause, the limited intrusion involved in the testing, and the ready destructibility of GSR evidence, we are satisfied the search was objectively reasonable in time and scope to pass constitutional muster.

An analysis of the timeline reveals that the 911 report of shots fired occurred at approximately 1:00 p.m., defendant was arrested at 2:40 p.m., Vogt's crime scene investigation began at 2:43 p.m., and the administration of the test occurred at approximately 5:40 p.m.  Although plastic bags were placed over defendant's hands when he was arrested, by that time, over an hour

and a half had already passed since the reported shooting and there was a cognizable risk that GSR would "dissipate" on its own or be "wip[ed] . . . away" by the shooter. Thus, time was of the essence to preserve potential evidence of the crime for which defendant was a suspect, notwithstanding the fact that it was not the predicate for defendant's lawful arrest. "Pragmatic necessity requires that we uphold the validity and reasonableness of a search incident to arrest if the search is part of the specific law enforcement operation during which the search occurs[,]" as was the case here. Oyenusi, 387 N.J. Super. at 156 (quoting United States v. Nelson, 102 F.3d 1344, 1347 (4th Cir. 1996)). See also State v. Pierce, 136 N.J. 184, 213-14 (1994) (acknowledging "the right of a police officer, following a valid custodial arrest . . . to conduct a search of the person of the arrestee solely on the basis of the lawful arrest.").

After conducting his investigation, Vogt arrived at police headquarters at 5:10 p.m. to administer the test. However, upon learning that defendant refused to consent, a further delay occurred when Vogt consulted an assistant prosecutor for legal advice. As a result, the test was not administered until three hours after defendant's arrest. There is no indication in the record that anyone else in the agency was trained in administering the test. Given Vogt's investigative responsibilities, we are satisfied the delay was not objectively unreasonable. Accordingly, considering the timeline and the fragility of GSR,

25

the search was conducted within a reasonable amount of time after defendant's arrest and "occur[ed] as part[] of a single transaction, [and] as connected units of an integrated incident." Doyle, 42 N.J. at 343.

Unlike the motion judge, we do not conclude that the search taking place at police headquarters, rather than "the sight of [defendant's] arrest," invalidates the search. A search for evidence incident to an arrest "may legally be conducted later when the accused arrives at the place of detention." Edwards, 415 U.S. at 803. Similarly, unlike the motion judge, we do not require a finding of exigency to validate the search because "if the arrest . . . is lawful the search . . . [is] not invalidated solely because the officers had adequate time to procure a search . . . warrant." Doyle, 42 N.J. at 343. Indeed, in Edwards, the defendant's clothing was not seized until ten hours after his arrest. 415 U.S. at 801. The Court noted "[i]t was no answer to say that the police could have obtained a search warrant, for the . . . test [is] not whether it was reasonable to procure a search warrant, but whether the search itself was reasonable, which it was." Id. at 807.

Our Supreme Court has acknowledged that "the proper inquiry for determining the constitutionality of a search-and-seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable." Watts, 223 N.J. at 514 (quoting State v. Bruzzese, 94

N.J. 210, 219 (1983)). The Court has also recognized that "[t]here are numerous situations that arise in law enforcement that are unique and call for a special response." Ibid. (quoting Bruzzese, 94 N.J. at 228). Simply stated, "[t]he test is not whether there were other reasonable or even better ways to execute the search, for hindsight and considered reflection often permit more inspired after-the-fact decision-making." Ibid. (citing State v. Hathaway, 222 N.J. 453, 469 (2015)). "For purposes of our Federal and State Constitutions, it is enough that the police officers, in performing their duties, acted in an objectively reasonable fashion," id. at 515, as they did here.

Turning to the scope of the search, the GSR test involved only the surface of the skin. The test was non-invasive, brief, and performed only to recover evidence of GSR stemming from defendant's suspected involvement in the shooting. See Birchfield, 136 S. Ct. at 2177 (contrasting blood tests and DNA samples collected by law enforcement authorities with breath tests, noting "breath tests are capable of revealing only one bit of information, the amount of alcohol in the subject's breath."). There is no indication in the record that the test caused undue harm, was unreasonably uncomfortable, or was unduly intrusive. On the contrary, although defendant had to keep his hands in bags for two and a half hours, he "had the ability to grasp things" notwithstanding the fact that he was already handcuffed. See ibid. ("In prior

cases, we have upheld warrantless searches involving physical intrusions that were at least as significant as that entailed in the administration of a breath test."); O'Hagen, 189 N.J. at 162 (holding that a "cheek swab is a very minor physical intrusion upon the person" and "is no more intrusive than the fingerprint procedure . . . that a person must already undergo as part of the normal arrest process"); State v. Ravotto, 169 N.J. 227, 238 (2001) (finding that even the taking of a blood sample has been held to be "minimally intrusive" (citing Schmerber, 384 U.S. at 771)).  Thus, we are satisfied the GSR test was objectively reasonable in scope.

In sum, we conclude defendant was subjected to a search when his hands were swabbed for GSR evidence following his lawful arrest.  Although the search did not occur at the same time or place as his arrest, under the totality of the circumstances, the delay and proximate location were objectively reasonable, and the search itself, which was minimally intrusive in nature and limited in purpose, was objectively reasonable in scope.  Thus, we conclude the search was constitutionally permissible under the search incident to arrest exception to the warrant requirement and the motion judge erred in ruling otherwise.  By tailoring our holding to warrantless searches for GSR evidence following a lawful arrest, we neither untether the search incident to arrest exception to the warrant requirement from its justification nor give police free

28

reign to conduct warrantless searches without probable cause at any point after a lawful arrest.

Reversed and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4554-18T4